## LATTA *v.* KILBOURN.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 97. Argued November 21, 22, 1893. — Decided December 11, 1893

A decree in chancery, which determines that a partnership existed between the parties, that one partner is entitled to recover of the other a share in the profits of the partnership business, that the defendant partner account to the plaintiff partner, and that the case be referred to a master to state such account upon proofs, is not a final decree.

The plaintiff set up in his bill a verbal contract of partnership between the defendant and himself in the buying and selling of real estate, and called for an answer under oath. The defendant answered under oath, denying positively and in direct terms the existence of the alleged contract of partnership. *Held*, that, under well settled rules of equity pleading and practice, this answer could be overcome only by the testimony of at least two witnesses, or of one witness with corroborating circumstances, and that the proofs in this case fail to break down the defendant's denial.

The violation by one partner of his undertaking to give to the firm or his associate an opportunity or option to engage in any particular transaction, not within the scope of the firm's business, does not entitle his co-partners to convert him into a constructive trustee in respect to the profits realized therefrom.

An agreement by partners that no one of them should engage in the buying and selling of real estate on his own account does not entitle the other partners to share in profits made by one of them in real estate speculations, entered into by him without first securing the assent of his copartners.

*Dean* v. *McDowell*, 8 Ch. D. 345, approved and followed.

If a member of a partnership uses information obtained by him in the course of the transaction of the partnership business, or by reason of his connection with the firm, for purposes wholly without the scope of the partnership business, and not competing with it, the firm is not entitled to an account of any benefit derived therefrom.

THE appellees, as members of a dissolved copartnership, brought this suit against the appellant, another member thereof, for an account of profits made by the latter in certain transactions alleged to have been within the scope of the part- nership business, and which, as claimed, it was his duty to have conducted for the benefit of the firm instead of for his individual advantage.

The material facts of the case, as disclosed by the pleadings and proofs, are as follows. In 1865 there existed in the city of Washington a copartnership composed of R. M. Hall, C. H. Kirkendall, and Hallet Kilbourn, under the name of Hall, Kilbourn & Company, which was formed for the purpose of carry- ing on the business of " real estate brokers and auctioneers." The scope of this partnership, as indicated by the nature of its business, was one of agency, and consisted in negotiating and making sales and purchases of real property for the account of others.

In the latter part of 1865, Kirkendall withdrew from the firm, and the appellant Latta acquired and succeeded to Hall's interest therein, and thereafter the business of copartnership was conducted under the name of Kilbourn & Latta. These changes in the membership of the firm were attended with no change in the nature and scope of the partnership business, which continued the same after Latta came into the firm as before, except that the business of auctioneers was discontinued.

The partnership agreement of the former firm, as well as that of Kilbourn & Latta, was in parol, and the business of each, as proclaimed to the world by their advertising cards in the news- papers, by the sign at the firm's place of business, by letter heads, and as published in the city directory, was that of " real estate and note brokers," and consisted in buying and selling

real estate on commission, renting houses, and negotiating loans. Kilbourn & Latta, as a firm, had no capital and owned no property except a few articles of office furniture of little value; nor was there any agreement, arrangement, or provision made by which capital was to be supplied for the use of the firm, if any should be needed or required in the conduct of its business. The personal services of the partners constituted the only means of carrying on the business of the firm, and each member was to share equally in the profits and losses of the business. Kilbourn was without means, while Latta was possessed of considerable property.

During the existence of this partnership, which continued from 1866 to January 1, 1871, each member of the firm, with the knowledge of his copartner, purchased real estate and other property on his private or individual account, and no question was ever made by either partner of the right so to do, nor did either partner ever claim that the profits realized on such purchases should be treated as belonging to the firm, or were subject to division among its members. By special agreement, and as a special venture, the partners purchased on firm or joint account two parcels of land on speculation — the money to make the purchases being advanced by Latta, in whose name the title was taken. In the same way, by special agreement, they purchased bonds and other securities, and special accounts of such transactions were kept upon the firm's books. In several instances the partners, by special and mutual agreement, in lieu of commissions took a share of the profits in property purchased and sold for the account of others, without assuming or incurring any responsibility for losses.

The two purchases of real estate on joint account, as well as those in which the partners of the firm took a share of profits in lieu of commissions, were special ventures in each case, entered into after special agreement between the partners, and were in no sense within the terms or objects, expressed or implied, of their regular partnership business. The scope and character of the firm's business did not extend to the buying and selling of real estate on account of the firm. It had no capital for that purpose, and no arrangements were

provided by which it was to be supplied. The profits of the business were drawn and distributed as fast as earned.

On January 1, 1871, John F. Olmstead, who had been for many years a clerk for Kilbourn & Latta at an annual salary of twelve or fifteen hundred dollars, was admitted as a partner into the firm. The new partnership carried on its business under the same firm name of Kilbourn & Latta — the respective interests of the partners being three-eighths of the profits of the business each to Kilbourn and Latta, and two-eighths to Olmstead. This new firm, like the former, had no written articles of copartnership. The scope and character of its business, as well as the respective interests of the partners therein, rested in parol. Olmstead brought no means into the concern, and neither the firm nor any member thereof, except Latta, possessed any property or capital. There was not only no provision or agreement for the accumulation of firm capital, but the course of business was directly the reverse, the habit of the partners being to draw against their respective shares of the profits, and on December 31 of each year the accounts were adjusted, and whatever balance each member of the firm had to his credit was drawn out of the firm and placed to his individual credit. The profits of the business in which alone the partners were to share were thus annually divided and distributed according to their respective interests.

Under this new firm, as under the old, the scope and character of its business, as indicated and made known to the public through the sign over its place of business, in the cards which it advertised, in the city directory, and its letter heads and envelopes, was that of "real estate and note brokers." Aside from the scope and character of the firm's business as thus described and brought to the notice of the public, each of the three partners testified that the new partnership was a continuation of the business of the former firm of Kilbourn & Latta.

Latta states that "there was no change whatever made at the time he (Olmstead) came in as to the terms of the partnership or the scope of the partnership business."

Kilbourn states that he does "not remember now of any change late in the year 1870 in the firm of Kilbourn & Latta, except the agreement to take in Mr. Olmstead and the change in the division of the profits. In all other respects the firm continued afterwards just as it was before."

Olmstead testifies: "After I became a member of the firm it was agreed that we should do a brokerage business and a commission business, that we should buy and sell property when opportunity offered, and we had the facilities for doing it, and we should buy and sell securities, and do a general brokerage business, and a general commission business, a general speculative business. I have stated all the stipulations substantially as well as I can recollect them. These stipulations were entered into in one of the last days of December, 1870. I don't know that there was any discussion as to whether the business of the firm was to be different after I entered it from what it was before. I don't know that there was any new arrangement touching the business in which the firm was to embark. The partnership business of the firm was, as I understood, to be just what it had been. They were to go on, and to do what they had been doing for a year or two, with the same scope and breadth."

It was further testified by Kilbourn and Olmstead that when the latter came into the firm in January, 1871, an arrangement or stipulation was made that all real estate which was considered a bargain was to be first offered to the firm, or the members thereof, for purchase; that if the firm or any member thereof declined to make the purchase, the others could take it if they so elected, and if two declined one could take it, but that the firm was to have the first opportunity, and that it was left optional with the firm, and with each member thereof, to join in such purchase. Olmstead in his testimony states this alleged stipulation or arrangement as follows:

"There was an agreement that knowledge of any property that was offered for sale or any property that any of the members of the firm knew about should be communicated to the firm, and if they saw fit and were in condition they could

buy it; and if either member declined the other two could; or, two declining, one could; but everything pertaining to real estate was to be for the benefit of the firm and to be communicated to the firm. That was a verbal agreement. The first time I remember of its being fully talked about was a month or six weeks before we moved uptown, somewhere in the latter part of March or 1st April, 1871. After we went uptown it was talked about several times; it was an express injunction or stipulation of Mr. Latta's.

"There was one stipulation (I call it a stipulation) which was agreed on, a proposition made by Mr. Latta in the office on Seventh street and F, that I remember.

"Q. Was that after you entered the firm?

"A. Some little time before we made the purchase of part of lot 5, in square 157, and that was (what I have stated in the bill as nearly as I can state it now) that the knowledge or information or anything touching real estate should be communicated to the members of the firm; that any purchases of real estate should be for the benefit of the whole firm; that if any member did not wish to come in or was not conditioned to come in, the other two might, or, if two declined, then one might; the first and foremost was that everything pertaining to real estate operation and speculations was to be for the benefit of the firm. That was one of the conversations with Mr. Latta. . . . He wanted it very emphatically understood that what was done by the members of the firm was for the benefit of the firm in the way of real estate business operations.

"Q. No matter what form it took on?

"A. He stated what form — *that if he heard of any piece of property being for sale and saw an opportunity to make a speculation, or going into any interest in any operation, that it should be communicated to the other members.*"

Kilbourn states the arrangement as follows:

"Well, the agreement was to continue the business as we had been carrying it on, as it was laid down by Mr. Latta and acquiesced in and specially announced by Mr. Latta that in governing our business in the future in regard to the real

estate transactions, all information with reference to the pur-
chase and sale or negotiation of real estate acquired should be
submitted with a view that if the firm desired they could take
advantage of such information and operate in behalf of the
firm or any members of the firm, if the firm did not wish to
take hold as a firm. There were several talks and conversa-
tions with regard to the business at various times.

"Q. Was there any agreement as to either member of the
firm buying and selling real estate on his own account?

"A. The only agreement was, as I stated before, that all
knowledge or information with reference to the property
whatever developed was in the minds of any one of the mem-
bers a good investment it must be submitted to the firm, and
if the firm did not want it or did not like it, then any member
of the firm had the privilege of buying. The first condition
precedent was that the firm should be advised of everything
in relation to real estate transactions coming within the knowl-
edge of the firm. It was laid down by Mr. Latta himself very
emphatically, and after we moved up to Fifteenth and G
streets he referred to it once or twice."

He further testified —

"The arrangement in 1871, after Mr. Olmstead came in,
was that all property which was considered a bargain was to
be first offered to the firm for purchase, and if they wanted to
go in, well and good. If either one declined the others could
take it if they wanted to, and if two declined the third one
could take it; but the first consideration was to give the firm
the opportunity.

"It was a positive and emphatic agreement that all matters
connected with real estate, or operations in real estate that
suggested themselves as good things to either one of the part-
ners, should be presented to the firm; that all information in
connection with real estate should be stated to the firm, and
that in the matter of purchasing real estate the firm was to
have the first opportunity. If either member declined to go
in, then the other two could; and if two members declined,
then the other member had the privilege. That was a positive
agreement suggested and laid down by Mr. Latta himself. It

was stated when we were considering the question of taking Mr. Olmstead into the partnership, and it was agreed upon when we entered into the partnership, and reference was made to it two or three times subsequently   It was simply a parol agreement."

Latta, both in his answer and testimony, positively denied this stipulation.

This firm continued in existence from January 1, 1871, to January 1, 1877, when it was dissolved.  During this period one or more parcels of land were purchased as a speculation on joint account by the members of the firm, after special agreement so to do had been entered into between them. These transactions, like those of the former firm, were special ventures entered into after a special agreement between the partners, to make the particular purchases.  Bonds and other securities were also purchased from time to time under and in pursuance of special agreements between the partners.

These bond transactions were entered upon the books of the firm under what is called the "bond account," while the joint real estate transactions were kept under an account styled or headed "Kilbourn, Latta &. Olmstead."  This new firm did not, however, in any case make any speculative purchases of real estate on joint account with others, or upon any agreement or arrangement to take a share of the profits in lieu of commissions.  All the transactions on either firm or joint account, other than the brokerage business of the copartnership, were discussed and specially agreed upon before they were entered into.

Purchases on his individual account were made by Latta, the appellant, during the existence of the firm with the knowledge of one or both of the other partners, and without objection being made thereto.  Among other purchases made by him, in his individual name and for his individual account, were lots 34, 35, and 36 in square No. 445, in the city of Washington, designated as the Thyson lots, on the sale of which profits were made by him.  Olmstead knew of the purchase of these lots as early as 1873, and neither made objection thereto, nor set up any claim on behalf of the firm or of

the partners thereof, to a share of the profits made by Latta from the sale of the same.

In December, 1871, Latta entered into an agreement with Dr. Stearns by which they undertook to engage in the buying and selling of real estate in the District of Columbia on joint speculation, upon the terms that the capital to be invested should be furnished by Stearns, which, with interest, was to be first paid out of the proceeds of the sales of the property to be bought, and after the payment of all expenses the net profits of the speculation should be equally divided between the parties. Each party was to be equally responsible for any losses that might be sustained. Under this arrangement between them a number of lots and parcels of land were purchased in 1872, the titles to which were taken generally in the name of Stearns, but in one or more instances the title to property purchased was taken in the name of Latta. The purchases and sales of the lots and parcels of ground made by Stearns and Latta on joint account were conducted through the firm of Kilbourn & Latta, and were entered upon their books, and the firm received the regular commissions thereon, which amounted to about $5000.

Before these purchases on joint account were closed out, and the profits thereon were realized and distributed, Stearns, under date of July 30, 1872, executed and delivered to Latta a certificate, which recited that the real estate purchased under their arrangement was held by him on joint account, and that the terms of the joint account were as follows:

"The cash payments have been made by me; the future or deferred payments, principal and interest and taxes, are to be paid by me. I am to determine when, at what price, and on what terms any portion of it may be sold; and when any proportion of it is sold, I am to be repaid all the money I have paid out on account of that portion with six per centum interest on the amount. Then after all costs and expenses of the sale shall have been paid the net profits are to be divided equally between the said Latta and myself.

"JOHN STEARNS,

"Mr. Latta has a copy of this."

While this certificate of Stearns does not mention losses, it is satisfactorily shown that Latta was to divide the losses in the event the property, when sold, did not realize costs and expenses, and in one instance he did divide with Dr. Stearns the loss upon a parcel of ground purchased on joint account. For some of the purchases made on joint account with Stearns, Latta executed his individual notes, and in the course of the business drew from and deposited with the firm of Kilbourn' & Latta funds for the account of Stearns growing out of their joint enterprises.

While Latta did not consult his copartners, or obtain their assent to his engaging with Stearns in the joint purchases of real estate, he took no means of concealing it, and we are satisfied from the testimony in the case that Olmstead knew of these transactions of Latta with Stearns as early as 1873. He admits that he had a suspicion of it in 1874. The book-keeper of the concern states that he cannot understand how the other members could fail to know of it, and a disinterested witness, William H. Philip, testified that about May, 1873, when he inquired for Latta at the office of the firm, Mr. Olmstead stated that Mr. Latta had gone to Europe, and, in reply to the question whether for business or pleasure, further stated that " Mr. Latta had just closed out some real estate, or perhaps a large amount of real estate, that he and Dr. Stearns were interested in," and that a part of his business in going to Europe was to see Dr. Stearns and settle up their matters.

This direct testimony, in connection with the facts and circumstances surrounding the transaction of the business, leaves little or no room to doubt that Olmstead knew of the joint enterprises of Stearns and Latta as early as 1873.

This second firm of Kilbourn & Latta was dissolved in January, 1877, and, thereafter, in November, 1877, the appellees filed their bill against the appellant, in which, after reciting many of the facts already stated, they claimed that the purchases of the Thyson lots and the joint purchases made with Stearns were properly partnership transactions, and that he

(Latta) was accountable to them for the profits realized out of the same. The bill alleged that the profits realized from the purchases made with Stearns amounted to about the sum of $45,000, which was equally divided between Stearns and Latta, and that no part thereof was turned over to the firm of Kilbourn & Latta, but that it was wrongfully appropriated by Latta to his own use. The complainants further averred that they had no knowledge of these transactions of Latta & Stearns until after the dissolution of the partnership, and that Latta had conducted the same secretly and thereby had defrauded the complainants.

By the third paragraph of the bill it was averred that the copartnership was entered into for the purpose of carrying on the business of real estate agents and brokers, and the *purchase and sale of real estate* in the District of Columbia; and also averred that it was "further stipulated by said partnership agreement, by and between the plaintiffs and defendant, that all profits resulting from operations in real estate by said firm of Kilbourn & Latta, or by any member thereof during the existence of said partnership, should belong to said firm, and be entered upon the books of the firm, and paid into the partnership account; and it was further stipulated in said agreement that any information obtained by any member of said firm during the existence of said copartnership touching real estate with reference to its sale or purchase, or the consent of the owner of said real estate to sell the same, or the desire of any person to purchase real estate in said District, was to be communicated to said firm of Kilbourn & Latta, for the consideration of the several members, and the action of the firm thereon, and it was expressly agreed in said copartnership agreement that no member of said firm should, during the existence of said copartnership, engage in the business of buying and selling real estate in said District, on his own account, or with any other person or persons, except in cases where the proposed transaction had been explained to the firm, and said firm had declined to take any part therein. That pursuant to said agreement the said copartnership firm of Kilbourn & Latta entered upon the business for which it was formed, and con-

tinued said business for six years, to wit, from January 1, 1871, to January 7, 1877, on which last named date the said copartnership was dissolved."

After considerable proof had been taken the bill was amended by adding to the first paragraph of section four the averment "that by said agreement, after the payment of all expenses, and returning to said Stearns the amount invested by him, with interest thereon, the profit on sales of such real estate purchased for said Stearns were to be equally divided between him and said Latta. That said Latta, under said agreement, in fact, was to act as the broker of and for said Stearns, and to receive as compensation for conducting said business and furnishing and using therein the experience, information, and facilities which he possessed and enjoyed as aforesaid, one-half the net profits on all sales of real estate so purchased for said Stearns."

The prayer of the bill was as follows:

"1st. That the said defendant be ordered and adjudged to pay to the plaintiffs their full share of the profits arising from the said sales of real estate by the said John Stearns and James M. Latta, under and by virtue of their said secret agreement, together with the interest thereon, amounting in all, as plaintiffs are advised and believe, to the sum of sixty-five thousand dollars.

"2d. That said defendant be ordered to pay to the plaintiffs their just share of the proceeds of the sale of said lots 35 and 36, square 445, together with the interest thereon.

"3d. That said defendant be ordered to convey to the plaintiffs their just share in and to said lot (34), square 445.

"4th. That he be required to answer this bill under oath as fully and faithfully as if specially interrogated thereto.

"5th. That the plaintiffs may have such other and further relief in the premises as the nature of the case may require, and to your honors may seem meet and proper."

The defendant answered the bill under oath, and after admitting its formal allegations in reference to the existence and dissolution of the partnership of Kilbourn & Latta, denied that it was ever agreed, either in writing or by parol, that said

firms or either of them was to carry on the business of buying and selling real estate on partnership account, and that at no time, in fact, did either of said firms undertake to carry on such business; that by the terms of the copartnership agreement the scope and character of the business of each of said firms was that of "real estate and note brokers;" that this business continued the same after Olmstead came into the firm as before, and that it was so advertised to the world.

He further denied the allegations of the bill that there was any agreement, either written or in parol, that all profits resulting from operations in real estate by such firm, or any member thereof, should belong to the firm and be entered upon the books thereof, and be paid into the partnership account; or that there was any written or verbal stipulation that information obtained by any member of the firm during the copartnership, and touching real estate with reference to its sale or purchase, or the consent of the owner to sell the same, or desire of any person or persons to purchase real estate in the District of Columbia, should be communicated to the firm for the consideration of the several members, and the action of the firm thereon; or that it was agreed that no member of said firm should, during the existence of the copartnership, engage in the business of buying and selling real estate in the District of Columbia on his own account, or with any other person or persons, except in cases where the proposed transaction had been explained to the firm and it had declined to take part therein.

The answer also denied that either partner was under any disability to engage in the business of buying and selling real estate on his own account, or with any person or persons, without consulting the firm or the members thereof, and obtaining their consent so to do.

In his answer to the amended bill the respondent denied that he was to act as the broker of Stearns in their joint transactions; that he was to receive one-half of the profits on the sale of the real estate purchased by them as compensation for conducting the business and using therein the experience, information, and facilities he possessed as a member of the firm of

Kilbourn & Latta; and averred that by the terms of his contract with Stearns the purchases and sales made in pursuance thereof were to be on joint account, each party being entitled to share equally in the profits, and be equally responsible for one-half of the losses that might result. The answer furthermore set up the statute of frauds as a bar to the enforcement of the alleged new stipulations entered into when Olmstead came into the firm to the effect that the copartnership or the members thereof should be first given the option to take bargains in real estate before the individual members should make purchases thereof.

The defendant averred that all the real estate transactions entered into by either the first or the second firm of Kilbourn & Latta were the subjects of special agreements beyond the regular business of the copartnership, and that there never was a time during the continuance of either firm when, by virtue of the nature or scope of the copartnership business, and irrespective of special authority, either partner had the right to bind the firm or his copartners in respect to the purchase and sale of real estate; and, further, alleged the general facts already mentioned, in reference to the copartnership and its business.

After voluminous proofs had been taken the cause came on to be heard in the Supreme Court of the District of Columbia, October 27, 1886, when the complainants abandoned all claims against the defendant on account of the matters set forth in the sixth paragraph of their bill, relating to the Thyson purchases, and covered by the second and third prayers for relief, and thereupon the following decretal order was entered: "That the complainants are entitled to recover from said defendant their full share, viz., five-eighths of all profits realized by said defendant from said sales of real estate, referred to in the pleadings and proof in this cause, made by said John Stearns and said defendant, with interest thereon from the time when the same were so realized, it is, this 27th day of October, A.D. 1886, ordered, adjudged, and decreed that said defendant do account to the complainants for their said share of the profits aforesaid; that this cause be, and the same

hereby is, remanded to the court in special term, with instructions to refer the same to the auditor of the court to state said account upon the proofs in the cause, and such further proofs as the parties may offer, and for such further proceeding as may be lawful and proper under this decree; and that said defendant pay all costs of the cause." 5 Mackey, 304.

In accordance with that decree the cause was referred to the auditor of the court, who, after taking further proof, made his report showing that there was, on January 1, 1888, due the complainants from the defendant, on account of the latter's real estate transactions with Stearns, the sum of $21,562.59, with interest on $12,030.50 thereof from that date until paid. This report was excepted to, but the exceptions were overruled, and the report was confirmed November 30, 1888, and a decree entered in favor of the complainants against the defendant for the amount reported and costs of the suit. From that decree the present appeal was prosecuted.

*Mr. Walter D. Davidge* for appellant.

*Mr. Enoch Totten* and *Mr. William F. Mattingly* for appellees, to the question of jurisdiction, said:

The decree of October 27, 1886, was a final decree. It disposed of every matter in dispute in the pleadings. It practically established and declared the following, to wit: (1) That the agreement of copartnership is valid notwithstanding the fact that it was not in writing; (2) That the copartnership agreement did prohibit the defendant from engaging in buying and selling real estate in the manner pursued by him in connection with Stearns; (3) That the plaintiffs were entitled to five-eighths of all profits realized by the defendant out of the transactions with Stearns mentioned in the pleadings and proofs; (4) That the defendant should account to the plaintiffs for their share of the profits received by him; (5) That the cause should be remanded to the special term, thence to be referred to the auditor to state an account between the parties, and for such further proceedings as might be "*lawful*

*and proper under the decree;* " (6) That the defendant should pay all costs.

Such a decree ended the litigation and settled the whole controversy between the parties, so far as the pleadings and evidence disclosed them at that stage of the cause. When it was passed, nothing remained but a mere matter of computation, so far as the cause was then developed, and the reference to the special term was for the purpose of executing the decree according to its terms. *Thomson* v. *Dean,* 7 Wall. 342; *Lewisburg Bank* v. *Sheffey,* 140 U. S. 445; *McGourkey* v. *Toledo & Ohio Central Railway,* 146 U. S. 536; *Forgay* v. *Conrad,* 6 How. 201; *Winthrop Iron Co.* v. *Meeker,* 109 U. S. 180; *St. Louis &c. Railroad* v. *Southern Express Co.,* 108 U. S. 24; *Missouri, Kansas &c. Railway* v. *Dinsmore,* 108 U. S. 30; *Whiting* v. *Bank of the United States,* 13 Pet. 6; *Bronson* v. *Railroad Co.,* 2 Black, 524.

It is respectfully submitted that the appeal should be dismissed for want of jurisdiction.

MR. JUSTICE JACKSON, after stating the case, delivered the opinion of the court.

It is first contended on behalf of the appellees that this appeal cannot be entertained by this court for the reason that the decree of October 27, 1886, was the final decree in the cause from which an appeal should have been taken. We are clearly of opinion that this proposition cannot be sustained. It is well settled by the decisions of this court that where the purpose of the suit is to obtain an account, such as that prayed for by the bill in this case and directed by the order of October 27, 1886, the decree is of such an interlocutory character that no appeal will lie therefrom. *Beebe* v. *Russell,* 19 How. 283, 285; *Green* v. *Fisk,* 103 U. S. 518; *Keystone Manganese Co.* v. *Martin,* 132 U. S. 91; *Lodge* v. *Twell,* 135 U. S. 232; *McGourkey* v. *Toledo & Ohio Central Railway,* 146 U. S. 544, 550. In this last case the authorities are thoroughly reviewed as to what constitutes a final decree, and it was laid down as the general rule that if the court made the decree

fixing the rights and liabilities of the parties, and thereupon referred the case to a master for a ministerial purpose only, and no further proceedings in court are contemplated, the decree is final; but if it referred the case to him for a judicial purpose, as to state an account between the parties upon which a further decree is to be entered, the decree is not final.

In decretal orders, like that of October 27, 1886, the whole case is open for revision, and the court may change its rulings relating to the merits when the cause comes on for final hearing upon the account. *Fourniquet* v. *Perkins*, 16 How. 82, 84.

The claim made by the amended bill that Latta in the transactions with Stearns acted only as a broker, and that his share of the profits realized therefrom was only by way of compensation for conducting such business and using therein the experience, information, and facilities he acquired from his connection with the firm, (which was denied under oath,) has not been insisted upon, and was clearly based upon a mistaken idea as to the true character of the purchases made on joint account by Stearns and Latta. It is not material to determine whether those purchases constituted a partnership between Stearns and Latta, or created the relation of tenants in common between them. The right of control retained by Stearns would indicate that their relation, in respect to these purchases, was that of tenants in common. *Clark* v. *Sidway*, 142 U. S. 682, 690.

The court below based its opinion upon two grounds: First, that the scope of the copartnership business and agreement, as alleged in the third paragraph of the bill, (quoted above,) was established, and that the appellant could not engage in purchases of real estate on his own account or in connection with others, except by the consent of his copartners, without violating the duty and obligation which he owed to his firm; and, secondly, that even if the copartnership did not include the business of buying and selling real estate on partnership account, still the appellant could not employ the knowledge and information acquired in the course of the partnership business in respect to the real estate market, in making purchases or transactions for his own benefit.

The general principles on which the court proceeded admit of no question, it being well settled that one partner cannot, directly or indirectly, use partnership assets for his own benefit; that he cannot, in conducting the business of a partnership, take any profit clandestinely for himself; that he cannot carry on the business of the partnership for his private advantage; that he cannot carry on another business in competition or rivalry with that of the firm, thereby depriving it of the benefit of his time, skill, and fidelity without being accountable to his copartners for any profit that may accrue to him therefrom; that he cannot be permitted to secure for himself that which it is his duty to obtain, if at all, for the firm of which he is a member; nor can he avail himself of knowledge or information, which may be properly regarded as the property of the partnership, in the sense that it is available or useful to the firm for any purpose within the scope of the partnership business.

It therefore becomes necessary, in testing the liability of the appellant to account for the profits realized from the transactions with Stearns, to consider and ascertain what was the scope of the partnership agreement in reference to the purchase and sale of real estate. This is the underlying and essential fact on which rests the proper determination of the question whether the appellant, in engaging in the joint enterprises with Stearns, violated any duty or obligation which he owed to the firm of Kilbourn & Latta. In other words, the question on this branch of the case depends entirely upon this: Were or were not those transactions within the scope of the firm business, in respect to which Latta owed a duty to his firm, or in respect to which he could properly be said to be the agent of the firm?

In his answer, which was called for under oath, Latta positively and in direct terms denied the allegation of the bill that it was ever agreed that the firm should carry on the business of buying and selling real estate, and that at no time was such transaction within the scope of the partnership business.

Under the well-settled rules of equity pleading and practice, his answer must be overcome by the testimony of at least two

witnesses, or of one witness with corroborating circumstances. The proofs in the present case not only fail to break down his denial on this point, but on the contrary affirmatively establish that neither under the first nor the second firm of Kilbourn & Latta did the partnership agreement extend to the business of buying and selling real estate either for investment or for speculation on firm account. Neither of the appellees testified to the contrary. The appellee Kilbourn, when pressed upon the question, evaded a reply thereto, and Olmstead, in his sworn testimony, failed to support the allegation of the bill as made on that particular subject. On the other hand, the testimony of the appellant fully supported the denial of his answer, and he is corroborated by all the facts and circumstances in the case, such as the character of the business as advertised and as actually conducted. The well-known characteristics of "real estate and note brokers," indicating, as the words imply, those engaged in negotiating the sale and purchase of real property for the account of others, afford a presumptive limitation upon the scope of the business, such as the appellant asserted and testified to in this case. His sworn answer and testimony on this point has not been overcome by the vague and equivocal testimony of the appellees. The court below was in error in finding as a matter of fact that the partnership extended to the buying and selling of real estate for the account of the firm. There is, therefore, no right on the part of the complainants to relief in this cause, based upon the consideration that the scope and character of the partnership business embraced the purchase and sale of real estate, either for the firm alone, or jointly with others.

The further allegation of the bill, " that all profits resulting from operations in real estate by any member of the firm of Kilbourn & Latta during the existence of said partnership should belong to said firm and be entered upon the books of the firm and be paid into the partnership account, and that no member of said firm should engage in the business of buying and selling real estate in the said District on his own account, or with any other person or persons, except in cases where the proposed transaction had been explained to the said firm, and

the firm had declined to take any part therein," was also positively denied by the answer of the appellant under oath. There is no testimony in the cause to overcome that denial. On the contrary, the evidence establishes that there was no such restriction or limitation imposed upon the individual members. So that, the complainants were entitled to no relief on that ground.

But aside from the foregoing questions of fact, how stands the case on the assumption that there was a new stipulation or agreement when Olmstead was taken into the firm, (as claimed by Kilbourn and Olmstead, and as set out above,) that knowledge and information obtained by any member of the firm as to bargains in real estate should be first communicated to the firm, with the view of giving the firm, or the members thereof, the first opportunity of purchasing, before any individual member thereof could act upon such knowledge or information for his own benefit? Can the agreement to furnish information as to bargains in real estate and give copartners the option of taking benefit of such bargains, be considered as so enlarging the scope of the partnership business as to include therein the purchase and sale of real estate on joint account? It would be a perversion of language and a confusion of ideas to treat such a stipulation, if it were clearly established, as creating a partnership in future options to buy what did not already, by the terms of the copartnership, come within the scope and character of the partnership business. That alleged stipulation, instead of enlarging the partnership business, was manifestly a restriction and limitation upon the power and authority of the copartners to bind the firm, or the members thereof, in any real estate transaction, until each member had expressly consented or agreed to join in the particular purchase, specially submitted for consideration.

By the well-settled law of partnership each member of the firm is both a principal and an agent to represent and bind the firm and his associate partners in dealings and transactions within the scope of the copartnership. No express authority is necessary to confer this agency or fiduciary relation in respect to the business of the firm. If the buying and selling

of real estate was a part of the business of Kilbourn & Latta, the alleged stipulation about giving an option to the firm and the members thereof to accept special bargains would have been an idle arrangement. But under the alleged stipulation each and every purchase of real estate was a special and individual transaction or enterprise, requiring the special assent and agreement of each partner thereto, before it became a subject of partnership, or was brought within the scope of the partnership business. Under the operation of the agreement, a partner who purchased real estate, either on joint or partnership account, did so not under or by virtue of the partnership articles, or under authority derived from the partnership business and his implied agency to represent the firm therein, but solely and exclusively from the special assent or agreement of his associates to engage in that particular purchase. So that each parcel of real estate to be acquired, as well as the agreement to purchase the same, was first made the subject of a special arrangement. It is difficult to understand how, under such circumstances and conditions, a copartnership could properly be said to include or extend to the business of purchasing and selling real estate.

The special subject of each purchase, as admitted by Kilbourn, — like the purchase of bonds and other securities, — did not and could not come within the operation of the copartnership, or become a part of the partnership agreement, until each particular piece of property had been selected and agreed upon. It is undoubtedly true that, under this alleged agreement, if a partner had submitted to the firm or his associates the question of buying a particular parcel of land, and they had agreed to make that purchase, he would thereafter have occupied an agency or fiduciary relation in respect to that particular piece of property. But the question here is whether his failure to give the firm, or his copartners, the opportunity of making an election to buy certain real estate, and his making the purchase thereof for his own account, or jointly with another, is such a violation of his fiduciary relations to the firm and his associates in respect to copartnership business as to entitle the latter to call him to account for profits real-

ized in such transactions. In other words, will the violation of his undertaking to give to the firm, or his associates, the opportunity or option to engage in any particular transaction, not within the scope of the firm's business, entitle the copartners to convert him into a constructive trustee in respect to the profits realized therefrom?

That the members of the firm, prior to 1871, or after that date, by special agreement, made purchases of particular parcels of real estate on speculation or for investment, did not make such speculative transactions a part of the partnership business so as to invest either partner with the implied authority to engage therein on account of the firm. The name of the firm was never, in fact, used in such special ventures, which no partner had authority to enter into except, and until, the consent of the others had been specifically obtained so to do — each instance of buying on firm or joint account being the subject of a separate, special, and distinct agreement.

It may be said of any and every partnership, irrespective of its regular business, that by consent of all the members, other matters beyond the scope of the partnership may become the subject of investment or speculation on joint account, but such special transactions cannot properly be said to come within the scope of the partnership. The very fact that the express consent of each partner was required in order to engage in such special ventures goes clearly to show that the transactions were not within the scope of the partnership, for, if they were, special consent could not be required as a condition precedent for engaging therein.

Matters within the scope of the partnership are regulated and controlled by a majority of the partners, but by the alleged stipulation under consideration a single member of the firm could control the firm's action in respect to purchases of real estate. This is inconsistent with the idea that the business of the firm extended to such purchases.

Again, the alleged agreement does not provide how such future acquisitions as might be specially selected or agreed upon for speculation or for investment were to be paid for, or in what proportion the several partners should be interested

therein. Neither does it distinctly appear from the allegations of the bill, nor from the testimony of the appellees, whether, in acting upon information given, the special purchases were to be made for the account of the partnership or for the account of the several members of the firm. The methods of keeping the accounts of such transactions in the name of the individual members rather than in the name of the firm would indicate that such purchases were for the benefit of the separate partners rather than for the firm.

There is no allegation in the bill, nor any direct statement in the testimony of the appellees, that if the information had been given as to the Stearns' transactions, either the firm or themselves would have exercised the option of engaging therein upon the conditions of allowing Stearns to determine "when, at what price, and on what terms any portion of the real estate might be sold." Neither is it alleged in the bill, nor shown by the proofs, that the appellant in any way neglected the partnership business, nor that the firm and his co-partners sustained any damage whatever from the transactions. On the contrary, it is shown that from the purchases and sales of the property bought on joint account with Stearns the firm derived its regular commissions.

This alleged new stipulation amounts, if it has any legal force and operation, simply to an agreement for a future partnership, or the joint acquisition of such special properties as might by mutual and unanimous consent be considered as holding out a prospect of profitable speculation; and at most could only be regarded as an agreement for a future partnership in respect to such properties as might be specially selected for speculation. It is well settled in such cases that no partnership takes place until the contemplated event actually occurs. It stands upon the same principle as an option to become a partner, which creates no partnership until the option is actually exercised.

If the stipulation in question could be construed into an agreement that no partner should engage in the buying and selling of real estate on his own account, would that entitle the other members of the firm to share in the profits that

Latta made in real estate speculations without having first secured the consent of his copartners to his engaging therein? No such proposition can be sustained.

In *Murrell* v. *Murrell*, 33 La. Ann. 1233, it was held that a partner who, in violation of the act of partnership, enters into another firm, does not thereby give the right to his original copartner to claim a share in the profits of the new firm. The violation of the agreement may give rise to an action for damages, but inasmuch as the original copartner could not be held, without his consent, for the debts of the new firm, he cannot claim to be made a partner therein.

In *Dean* v. *McDowell*, 8 Ch. D. 345, one of the stipulations in the articles of copartnership was that " said C. A. McDowell should diligently and faithfully employ himself in and about the business of the partnership, and carry on and conduct the same to the greatest advantage of the partnership," and by another article it was stipulated that neither partner should "either alone or with another person, either directly or indirectly, engage in any trade or business except upon the account and for the benefit of the partnership." The business of the firm was to deal as merchants and brokers in selling the produce of salt works on commission, and during its existence McDowell clandestinely purchased a share in a firm of salt manufacturers. A bill was filed by the other partner for an account of the profits realized in the new business, and it was held by the master of the rolls that the bill could not be sustained. On appeal this judgment was affirmed. Lord Justice James, after stating the general principles of partnership law, said: " The business which the defendant has entered into was that of manufacturing salt, which was to be the subject-matter of the trade of the first firm. If in that he had in any way deprived the firm of any profits they otherwise would have made — if by his joining in the partnership for the manufacture he had diverted the goods from the firm in which he was a partner to some other firm, I can see that that would be a breach of his duty; but it is not pretended or alleged that any alteration took place in the business of the firm by reason of his having become a share-

holder in the other business. It is not pretended that there was any alteration in the commission or anything else. Everything remained exactly as it was, so that it cannot be suggested that there was a farthing's worth of actual damage done to the original firm by reason of his having become a shareholder in the works which produced the thing in which the firm traded. Under these circumstances it seems to me that we cannot say his profit from the new business was a benefit arising out of his partnership with the plaintiffs. It was not a benefit derived from his connection with the partnership, or a benefit in respect of which he was in a fiduciary relation to the partnership. His relation to the partnership in this respect was the same as an ordinary covenantor to a covenantee in respect of any other covenant which is broken. It was a covenant by a partner with a copartner, a covenant that he would not do something which might result in damage. But it was not a covenant, in my view, which was in any way connected with the fiduciary relations between the parties. That being so, it seems to me that the Master of the Rolls was right in saying that you cannot extend the cases with regard to a share in the profits to a case in which, as between the parties, there really was nothing but a breach of covenant, which in truth did not result, and could not have resulted, in the slightest loss to the partnership, unless it could have been shown that it led to the covenantor neglecting the business of the partnership, and devoting himself to other business, and diverting his time and attention from the business to which it was his duty to attend." These views, which were concurred in by the other members of the court, are directly in point in the present case, which, in principle, cannot be distinguished from the case there under consideration.

We are clearly of opinion that the alleged new stipulation that each copartner should furnish to the firm, or to the members thereof, information as to bargains in real estate, and give it or them the option to engage in the acquisition thereof before acting upon such information for his own benefit, neither enlarged the scope of the partnership so as to make it include the purchases and sales of real estate, nor precluded

any member of the firm from making purchases on his own account or jointly with others; and that the act of the appellant in purchasing property with Stearns was not such a violation of his duty and obligation to the firm of Kilbourn & Latta, or to the members thereof, as to entitle the appellees to share in the profits which he realized therefrom.

In respect to the second ground, on which the court below rested its judgment, that the appellant could not take advantage of the skill, knowledge, and information as to the real estate market acquired in the course of his connection with the partnership of Kilbourn & Latta so as to gain any profit individually therefrom, but was bound to share with his copartners all the beneficial results which could be derived from his knowledge or information on that subject, we need not do more than to say that this proposition is wholly unsupported either by the authorities or by any legal principle applicable to partnership law.

It is well settled that a partner may traffic outside of the scope of the firm's business for his own benefit and advantage, and without going into the authorities it is sufficient to cite the thoroughly considered case of *Aas* v. *Benham,* 2 Ch. D. 1891, 244, 255, in which it was sought to make one partner accountable for profits realized from another business, on the ground that he availed himself of information obtained by him in the course of his partnership business, or by reason of his connection with the firm, to secure individual advantage in the new enterprise. It was there laid down by Lord Justice Lindley that if a member of a partnership firm avails himself of information obtained by him in the course of the transaction of the partnership business, or by reason of his connection with the firm, *for any purpose within the scope of the partnership business, or for any purpose which would compete with the partnership business, he is liable to account to the firm for any benefit he may have obtained from the use of such information; but if he uses the information for purposes which are wholly without the scope of the partnership business, and not competing with it, the firm is not entitled to an account of such benefits.*

It was further laid down in that case, in explanation of what was said by Lord Justice Cotton in *Dean* v. *McDowell*, *ubi supra*, that "it is not the source of the information, but the use to which it is applied, which is important in such matters. To hold that a partner can never derive any personal benefits from information which he obtains as a partner would be manifestly absurd;" and it was said by Lord Justice Bowen that the character of information acquired from the partnership transaction, or from connection with the firm, which the partner might not use for his private advantage, is such information as belongs to the partnership in the sense of property which is valuable to the partnership, and in which it has a vested right.

Tested by these principles, it cannot be properly said that Latta used any information which was partnership property so as to render him chargeable with the profits made therefrom. His knowledge of the real estate market, or in respect to profitable investments therein, was not used in competition with the business of the firm, nor in any manner so as to come within the scope of the firm's business.

The points already considered being sufficient to dispose of the case, we do not deem it necessary to go into the other question discussed as to whether a parol partnership, in respect to purchasing and selling real estate, or an agreement between copartners to give each other the option of engaging in such purchases, would come within the operation of the statute of frauds.

We are clearly of opinion, upon the whole case, that the decree should be

*Reversed, and the cause remanded to the court below with directions to dismiss the bill at the cost of the appellees.*

MR. JUSTICE HARLAN did not hear the argument and took no part in the consideration or decision of this case.