MARMAC INVESTMENT COMPANY INC. and Richardson Beard, Appellants,

v.

Robert N. WOLPE, Marcy S. Wolpe, Leveo V. Sanchez, Robert Decklebaum, Haryette Deckelbaum, Appellees.

No. 97–CV–2016.

District of Columbia Court of Appeals.

Argued Oct. 14, 1999.
Decided Sept. 21, 2000.

---

Jeff Evan Lowinger, Chevy Chase, MD, for appellants.

Robert E. Greenberg and Glenn W. Golding, Washington, DC, for appellees.

Before WAGNER, Chief Judge, RUIZ, Associate Judge, and BELSON, Senior Judge.

BELSON, Senior Judge:

All of the parties to this litigation are partners in 21st and F Street Associates Limited Partnership, a District of Columbia limited partnership. The appellants, Marmac Investment Company, Inc., and Richardson Beard, plaintiffs in the trial court, are limited and general partners who brought this action against Robert N. Wolpe, the sole managing general partner. They asserted that he breached his fiduciary duties to them by agreeing to pay his affiliated company, Robert N. Wolpe Enterprises, Inc. (Enterprises), in which he and his wife were the principal shareholders, a consulting fee in connection with the sale of realty owned by the partnership. Appellants requested that the court order a return of a *pro tanto* share of the consulting fee paid to Wolpe and conduct an accounting of all transactions related to the sale of the realty.[1] The trial court, sitting without a jury, entered judgment in favor of appellees, defendants in the trial court, finding that appellee Wolpe did not breach the partnership agreement or his fiduciary duties to appellants by agreeing to pay Enterprises a consulting fee for the real estate brokerage and related services it performed for the partnership. We affirm.

## I.

We begin by summarizing the facts as found by the trial judge or not disputed by the parties. 21st and F Street Associates Limited Partnership ("the partnership") was created in 1986 pursuant to a partnership agreement which was subsequently amended several times. The primary business of the partnership was the development and leasing of a residential rental building known as "The Dakota," located near George Washington University ("GWU") in Northwest, Washington, D.C.

In the Spring of 1994 it became apparent that refinancing for the Dakota would be necessary, and that each general partner would have to contribute a certain sum of money to bring it about. At that time the general partners unanimously decided that the managing general partner, Wolpe, should attempt to sell the Dakota for a price that would net no less than approximately $200,000 for each of the seven partners in the partnership. After listing with three real estate brokers failed to produce a sale, Wolpe himself contacted the real property manager of GWU regarding the sale of the property. Later, he effected a consulting agreement between the partnership and Enterprises. A copy of the consulting agreement was not sent to the other general partners. Wolpe was autho-

---

1. As indicated in the complaint, all general partners were joined as defendants so as to allow the trial court to grant an accounting of the partnership assets. The joining of all general partners was necessary for a formal accounting because the accounting "results in a money judgment for or against each partner according to the balance struck." CRANE & BROMBERG, LAW OF PARTNERSHIP § 72 (1968). Further, "A partnership at common law is not a legal entity, but only a contractual status.

Suits affecting partnership matters must be brought by or against the members of the firm." *Id.* at § 58. The Uniform Partnership Act of 1996, D.C.Code Section 41–151.1, et al. (1996), postdates the events in this matter and does not directly apply here. We note that § 41–152.1(a) of the 1996 Act changed the common law of partnership. It provides: "A partnership is an entity distinct from its partners." *Id.*

rized by Section 4.02(b) of the partnership agreement to engage in such self-dealing. This section provides that "the Partnership may contract with any person or entity, including any Affiliate ... for the performance of any and all services which may be necessary or advisable to carry on the Partnership's business...." The partnership agreement defines "affiliated person" or "affiliate" to include any "Entity which directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with any person referred to in the preceding clauses."

Under the consulting agreement, Enterprises agreed to arrange the sale of the Dakota to GWU and "to take such other action(s) in furtherance thereof, as may be necessary in the Consultant's opinion to attempt to arrange and ultimately consummate any such sale." The agreement provided that as compensation for arranging a successful sale of the Dakota to GWU for a gross sales price of not less than nine million dollars, "the Partnership shall pay Consultant a consulting fee ... in an amount equal to 3.5% ..." of the final gross sales price. At the time of the transaction Wolpe's real estate brokerage license had lapsed, and Enterprises had no license.[2]

Wolpe spoke with all the other general partners about the possible sale of the Dakota to GWU in the Fall of 1994. Wolpe testified that he informed the general partners about the 3.5% consulting fee he arranged with Enterprises. Appellant Beard and the president of Marmac, however, insist that they were never informed about the amount of the fee. The court did not resolve this conflict in the testimony. Another general partner said he could not recall whether Wolpe had discussed the amount of the fee with him. Appellants admit that they were aware that Wolpe intended to receive a fee. Successfully arranging for the sale entailed a large amount of work beyond that required by Wolpe's normal duties as managing partner.

In November 1994, the partnership entered into a contract with GWU to sell the Dakota for $9.6 million. Several weeks before settlement, appellants were given copies of an option agreement entered into between GWU and the partnership, and an agreement of sale. Both agreements referred to a consulting fee to be paid to Enterprises by the partnership out of the sale proceeds, but did not specify the amount of the consulting fee. The option agreement also made reference to the consulting agreement. Appellants did not inquire of Wolpe concerning the amount of the fee at any time before settlement.

Settlement on the sale of the Dakota took place in early 1995. A settlement disbursement sheet was then sent to the general partners; the disbursement sheet indicated that a 3.5% fee, in the amount of $336,000, had been paid to Enterprises. According to appellants, they first became aware of the amount of the commission upon receipt of the settlement disbursement sheet.

Thereafter, appellants Marmac and Beard objected to the amount of the commission. Consequently, Wolpe distributed a letter to all general partners calling for a vote on the amount of the fee. All six of

---

**2.** We note that during closing argument a lengthy colloquy took place regarding whether the Brokerage Act applies to a corporation acting as a real estate broker. There is tension within the Act in this regard. Section 45–1922(12) defines real estate broker as "any person, firm, association, partnership, or corporation (domestic or foreign)...." However, Section 45–1927(a) indicates that in order to qualify to receive a real estate license a person must be eighteen years of age or older, be able to read, write and understand English and be a high school graduate or the holder of a high school equivalency certificate. Thus the purport of the Act is not clear as to whether a corporation is capable of possessing a real estate license or whether it can comply with the Act only through the licensing of an agent. It is clear in any event that neither Wolpe nor his corporation, Enterprises, was licensed at the time of the transaction.

the general partners completed and returned the ballots. While each partner agreed that Enterprises was entitled to a fee of some amount, there was not unanimous agreement as to the amount. The required majority of the partners (all but appellants) approved the 3.5% consulting fee. Marmac voted that the fee should be 1.5% while Beard voted it should be 2%.

## II.

Marmac and Beard filed a complaint against Wolpe (and the other general partners) alleging that Wolpe had breached the partnership agreement and his fiduciary duties to his partners. They contended that the breach consisted essentially of paying himself $336,000 in compensation for his services as managing general partner without the approval of all the general partners, in effect diverting partnership assets to himself through self-dealing. After suit was filed, appellants learned that Enterprises had no real estate broker's license, and thus at pretrial they added allegations that Wolpe breached the partnership agreement and his fiduciary obligations by contracting with an unlicensed entity without his partners' approval, and requesting ratification without disclosing Enterprises' unlicensed status. They also sought an accounting.

Appellees denied that Wolpe acted beyond his authority as managing general partner or breached the terms of the partnership agreement or any fiduciary duty, asserted that the fee charged was not only reasonable but was consented to by the partnership, and contended that the Brokerage Act did not bar the commission.

The trial court dealt first with appellant's allegation that Wolpe violated the Brokerage Act and, accordingly, the partnership agreement. It ruled that the type of work performed by Wolpe fell within the scope of the definition of real estate brokerage as set forth in the Act. D.C.Code § 45–1926(a). It further ruled that the ownership exemption from the requirement of a license, D.C.Code § 45–

1931(2), did not apply because Enterprises, which acted *inter alia* as broker, did not have any ownership interest in the Dakota.

The court went on to conclude, however, that the Act itself did not apply to the transaction in question, giving several reasons. First, "a primary purpose" of the Act was to prohibit unlicensed persons from bringing actions to recover fees for their services as real estate brokers, "as opposed to allowing automatic recoupment of such fees when there is a violation of the Act" as the courts have required in, e.g., cases involving "unlicensed home improvement contractors." The stated purpose of the Act of providing increased protection to the public against incompetence, fraud and deception in real estate transactions does not apply to this dispute among partners "who agree that Wolpe was qualified to negotiate the sales transaction, who essentially consented to Wolpe's action before the fee was paid by not objecting to the consulting agreement and, after the fee was paid, by a majority vote of partners, ... who knew Wolpe's corporation would be paid a fee and expected Wolpe to receive compensation for his work...." In addition, the public interest was not implicated here because Wolpe himself could have provided the same services permissibly under the Brokerage Act if he had done so in his capacity as managing general partner, as in that role he would have been within the ownership exemption of the statute. Finally, the court concluded, appellants failed to establish by a preponderance of the evidence that the fee was unreasonable.

The trial court also concluded that appellants had failed to establish by a preponderance of the evidence, upon a fair reading of the partnership agreement, that Wolpe had breached either the agreement or his fiduciary duties to his partners. The court took note of Wolpe's authority as the managing general partner under the partnership agreement; the unanimous approval of the general partners, including plaintiffs, for Wolpe's undertaking to sell

the Dakota; Wolpe's authorization under the partnership agreement to contract with any partner or affiliate (such as Enterprises) at reasonable and competitive rates to carry on the partnership's business; and the partnership's authorization under the partnership agreement to sell real estate. Any question about Wolpe's authority to contract with Enterprises for its work and fee, the court concluded, had been laid to rest by the subsequent majority vote of the general partners ratifying Wolpe's actions.

### III.

■ We agree essentially with the trial court's conclusions.[3] In reviewing them, we note at the outset that the action before us is not one against Enterprises for recovery or disgorgement of the fee it received, but rather an action against Wolpe himself for breach of the partnership agreement and his fiduciary duties arising therefrom, as well as for an accounting. We also observe that under the circumstances of this case the burden of persuasion remained, as the trial court perceived, on appellants.[4]

On appeal, appellants emphasize the contention that the Brokerage Act is significant because possession of a license issued pursuant to the Act is a condition precedent to the performance of brokerage services in the District of Columbia. Accordingly, they argue, because Enterprises did not act with the required license, its contract with the partnership was not "on terms and standards for performance customarily provided in the [District of Columbia]," as required by § 4.02(b) of the Partnership Agreement. The contract, they contend, must meet that test to come within the Partnership Agreement's limited exception to the general rule that prohibits a fiduciary from self-dealing.

■ We cannot agree with appellants that the partnership's express approval of Wolpe's dealings with his affiliate "Enterprises" was nullified if the Brokerage Act was to any degree violated. Even if we assume that a violation of the Brokerage Act was committed in that Enterprises performed brokerage services without a license, it does not necessarily follow that the consulting agreement with Enterprises was not "on terms and standards for performance customarily provided in this area." The lack of a brokerage license does not relate to the terms for performance of the consulting agreement. With respect to standards for performance, the status of being unlicensed does not necessarily reflect on the quality of the work that would be expected of Enterprises as a corporation, and at most raises a question concerning the qualifications of Wolpe, the individual actually supplying the services. In this case, however, as the trial judge found, appellants agreed that "Wolpe was qualified to negotiate the sales transaction."

---

3. We take the trial court's conclusion that the Brokerage Act does not apply to this case to mean that any violation of its provisions [by Wolpe or Enterprises] does not establish or support appellant's claim of breach of the partnership agreement.

4. During closing argument, counsel for appellants asserted, apparently for the first time, that the burden of proof was on appellees, but could cite no authority for that position. It is true that in many circumstances a fiduciary whose conduct is challenged must bear the burden of proving that he was faithful to his trust. See, e.g., Sheridan v. Perpetual Building Ass'n, 112 U.S.App.D.C. 82, 299 F.2d 463 (1962) (trustee under deed of trust loan who was also an officer and director of lending corporation has burden to establish propriety of challenged handling of foreclosure). "When a partner has engaged in self-dealing, that partner has the burden to prove the fairness of his actions...." Starr v. Fordham, 420 Mass. 178, 648 N.E.2d 1261, 1265 (1995). In this case, however, the partners expressly agreed to "self-dealing" by Wolpe, and all were aware that he would be paid a commission for his efforts. Under the circumstances, the trial court properly left on plaintiff the burden of establishing a breach of the partnership agreement or fiduciary duties concerning the amount of the fee, the timing of Wolpe's securing his partner's approval of the amount and related matters.

■ Thus we need not resolve the close and technical question of whether the Brokerage Act was violated, because any such violation is immaterial to the outcome here. Appellants concede that Wolpe would not have needed a license if he had provided the services in question solely as an agent of the partnership, but argue that because Wolpe transacted while acting for the corporation, a license was required. The difference in the capacity in which Wolpe acted, although in other respects legally significant, did not in itself convert his conduct into a breach of the partnership agreement. It would be more indicative of a breach if Wolpe's actions were so impermissible that the partnership would be entitled to the return of its fee from Enterprises under the standards we recently announced in *Remsen Partners., Ltd. v. Stephen A. Goldberg Co.*, 755 A.2d 412 (D.C.2000), but it is clear that any such effort to recover would fail.[5]

■ Having considered all of the circumstances and the provisions of the partnership agreement, the trial court ruled that Wolpe had breached neither the agreement nor his attendant fiduciary duties thereunder. We agree. Partners are accountable to one another as fiduciaries. D.C.Code § 41–120 (1981) ("Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners ..."). That means, fundamentally, that they owe one another the utmost good faith, fairness and loyalty. CRANE & BROMBERG, LAW OF PARTNERSHIP § 68 (1968). "The fiduciary nature of the partnership relation requires at all times the highest degree of good faith, and precludes any secret profit, benefit or advantage of any kind." 1 SCOTT ROWLEY, ROWLEY ON PARTNERSHIP 515 (1960). "Good faith will not permit any one partner to advantage himself singly and alone, at the expense of the firm." 1 SCOTT ROWLEY, THE MODERN LAW OF PARTNERSHIP 458 (1916), cited in Paula J. Dalley, *The Law of Partner Expulsions: Fiduciary Duty and Good Faith*, 21 CARDOZA L. REV. 181, 189 n.42 (1999). Although Wolpe did realize a fee from the real estate transaction, he did not do so to the detriment of the partnership. Wolpe earned the payment he received as compensation for the services which he provided. The partnership in no way suffered because of Wolpe's actions; to the contrary, the partnership benefitted from the sale of the property at a price which apparently netted each partner more than the partners initially instructed Wolpe to obtain. *See Beckman v. Farmer*, 579 A.2d 618, 625 (D.C.1990) (citing *Day v. Avery*, 179 U.S.App.D.C. 63, 74 n. 56, 548 F.2d 1018, 1029 n. 56 (1976)) ("breach of fiduciary relationship is not actionable unless injury arose to the beneficiary or the fiduciary profits thereby"); THEOPHILUS PARSONS, A TREATISE ON THE LAW OF PARTNERSHIP 225 (1867) (partner is liable "if he makes any private bargain ... for his own benefit, which either inflicts a loss upon the partnership, or turns to himself advantages which belong to all in common ...").

Central to the trial court's conclusion was the fact that all of Wolpe's partners knew that he was performing extraordi-

---

**5.** The trial court explained in its ruling that the stated policy purposes of the Act have little bearing upon the transaction involved here. As the court found, "this case involved a dispute between partners who agree that Wolpe was qualified to negotiate the sales transaction...." As the court also found, any impact on the public interest is minimized by the fact that Wolpe could have performed properly as a general partner acting for the partnership the very same services he rendered through Enterprises. D.C.Code § 45–1931(2).

Turning to the equities of the matter, it is clear that the appellants received valuable services performed efficaciously by Wolpe. While the appellant partners disagreed with the fee amount when it was put to a vote, the majority of the partners approved it, and appellants were unable to establish at trial that the fee was unreasonable in the real estate business. An appropriate weighing of public interest and the equities could result only in a decision that recovery of the fee paid to Wolpe by the partnership would not be appropriate in the circumstances of this case.

nary and burdensome work well beyond what was expected of him as managing general partner in order to effect the sale of a tenant occupied apartment building to GWU. All of the partners also knew that Wolpe would be paid a fee for his extra work. This is not therefore a situation in which a partner was making a secret profit at the expense of the partnership. *Cf. Latta v. Kilbourn,* 150 U.S. 524, 541, 14 S.Ct. 201, 37 L.Ed. 1169 (1893) ("one partner cannot, directly or indirectly ... take any profit clandestinely for himself...."). To the contrary, it was known that Wolpe would be paid for his services. While it may not have been known in advance how much he would be paid—the trial court made no finding on that point—the amount was subjected to partnership vote before being made final.

While we conclude that the trial court reached the correct result and that it considered the appropriate factors in doing so, we observe that Wolpe's conduct unnecessarily led to challenges that have required serious consideration. He could easily have sent copies of the consulting agreement to his partners but did not. While the trial court made no finding regarding whether Wolpe told his partners in advance of the amount of the fee, it would have been a simple thing for Wolpe to have obviated any doubt as to that matter. In addition, while Wolpe himself, as an owner, could have acted for the partnership without violating the Brokerage Act, he chose to act as a broker through a corporation, Enterprises, which in turn acted through Wolpe, whose license had lapsed, rather than through a licensed broker.

Although Wolpe's handling of some particulars was short of the ideal, we agree with the trial court's assessment that there was no breach. In sum, Wolpe acted in the partnership's best interest, worked effectively to obtain the results the partnership desired, had the agreement of all the partners that he·should be compensated and the agreement of the necessary major-

ity on the amount of the compensation. Under these circumstances, we affirm the trial court's conclusion that Wolpe did not breach the partnership agreement or his fiduciary duties.

*So ordered.*