McGAHEY et al. v. OREGON KING MINING CO.

(Circuit Court, D. Oregon. November 9, 1908.)

No. 3,035.

MINES AND MINERALS (§ 98*)—MINING PARTNERSHIP—CONSTRUCTION AND SCOPE OF AGREEMENT.

Complainants and other persons, who subsequently became the grantors of defendant corporation, formed a mining partnership for the purpose of prospecting and locating mining claims in a vicinity where one of the number had previously discovered a piece of gold-bearing quartz.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The members made two expeditions to the vicinity, and there located a number of claims and did some work thereon. While going on the last expedition, at a place where they stopped several miles from their claims, one of the number was given a piece of rock, picked up as float, and was told where it was found, which information was imparted to all. The rock was thrown with other samples, and no attention was paid to it until after the expedition, when the person to whom it had been given had it assayed, and, finding it to contain mineral in paying quantities, he and two others of the partners went to the place where it had been found, and after prospecting in the vicinity located a number of claims which they afterward conveyed to defendant corporation. *Held*, that the purpose of the partnership was accomplished at the end of the second expedition; that, since no mineral-bearing rock in place was found by the partners during that time in the vicinity where defendant's claims were subsequently located, there was no discovery which brought such claims within the scope of the partnership or entitled the other members to any interest therein when the claims were subsequently discovered and located by defendant's grantors.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 223; Dec. Dig. § 98.*

Mining partnerships, see note to G. V. B. Min. Co. v. First Nat. Bank of Hailey, 35 C. C. A. 515.]

In Equity.

Stephen A. Lowell, Oscar Cain, and J. C. Hurspool, for plaintiffs.
Bennett & Sinnott, for defendant.

WOLVERTON, District Judge. Some eight or ten years prior to 1897, Victor Wilson, who was then engaged in herding sheep in the locality of Trout creek, Crook county, Ore., discovered a piece of gold-bearing quartz of light color. He did not know its value. It was shown to an attorney from St. Louis, Mo., who desired to take it away with him and have it assayed. He was allowed to do so, and the rock was found to contain gold in considerable quantities. Without returning the quartz left after using sufficient for the assay, the attorney requested Wilson to take him to the locality in which it was discovered, and endeavored to make some arrangement with Wilson whereby they together might prospect for the lode out of which the quartz came, but all without avail. In 1897 Wilson became instrumental in forming an association of five persons, including himself, for the purpose of prospecting for the ledge. He related how he came to discover the quartz: That he picked up a rock which he supposed contained rubies in crystallized form, and, in endeavoring to break it open, struck it upon a rock jutting above the ground, and in doing so broke off the piece of quartz in question. He expressed confidence in his ability to return to the locality and identify the place where it was broken off.

The parties who became associated with him were G. M. Wilson (a distant relative), A. J. Tash, Richard McGahey, and John F. Kirby. There is much dispute in the testimony as to what agreement was reached between the parties, but a careful study thereof has brought me to the conclusion that it was agreed that an expedition should be made to the locality in question for the purpose of exploration,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and especially for the discovery of the supposed ledge from which the quartz obtained by Victor Wilson was broken, and that, when discovered, the five parties composing the association should share equally in the mine. This was undoubtedly the specific purpose of the agreement, but, believing that other ledges or mines might be discovered in the same vicinity, it was further agreed that the association should share equally in all mining properties discovered or located while upon the expedition. I think these are the limitations of the agreement: First, and especially, to discover the ledge from which Victor Wilson obtained the quartz, and to locate a mine or mining claims thereon; and, second, to make such other discoveries of mines within the vicinity as the parties might be able, to locate them accordingly, and to share equally in all such discoveries and mining properties thus acquired. It is immaterial what were the contributions of the respective parties towards defraying the expenses of the expedition. It is sufficient that it was understood and agreed that all of the associates were to contribute about equally towards the outlay attending the enterprise of discovery and the development of mining properties, and the agreement, although not in writing, may be considered to have been valid and binding upon the parties concerned.

During the month of June, or early in July, 1897, all the persons thus associated, except McGahey, entered upon the contemplated expedition, making a journey from Walla Walla, Wash., where the parties resided and the agreement was entered into, to Trout creek, in Crook county, Ore. In the vicinity of the junction of Amity creek with Trout creek, they made a discovery of a quartz ledge, which Victor Wilson thought to be the ledge from which the piece of quartz was formerly broken by him, although the rock did not appear to be the same in color, being of a bluish cast. Possibly some other ledges were discovered, but, at any rate, several claims were located by the individual members for the benefit of all. Nothing further was done at this time, except a little development work, and all the parties returned to Walla Walla. Later, about August or September of the same year, John F. Hubbard and A. M. Kelso were admitted as members of the association upon the same terms and conditions as the original members, and the agreement for exploration, discovery, and development of mining properties in and about the same locality was continued between all the parties so aggregated, thus increasing the membership of the association to seven instead of five. All the members of the association except McGahey and Kirby entered upon a second expedition to Trout creek. While on the way to the locality in view, and some 12 miles distant therefrom, a rancher by the name of Fernall, learning that the party was exploring for mines, gave to G. M. Wilson a piece of red colored quartz, at the same time telling him that he came across it up in Friend's field and waving his hand up towards the hillside in that direction. It was not taken from any ledge, but picked up as float. Wilson showed the rock to those of his associates then in his immediate company, and threw it in the wagon bed, where other

specimens of quartz were subsequently deposited; and all were taken to Walla Walla when the expedition returned. Some other discoveries were made in the vicinity of the prior locations, and other locations of claims were noticed and some development work done, but within a few weeks all the persons returned home. A disagreement arose between G. M. Wilson and John Hubbard and the other members of the expedition while about the claims, the result of which is involved in dispute. Wilson and Hubbard say that they renounced all relationship or connection with the association, thus putting an end to any further co-operation under the expedition agreement then subsisting; while others of the party assert that, while there was some controversy, it did not terminate in Wilson and Hubbard withdrawing from the association. All agree, however, that Wilson and Hubbard started home two or three days before any of the other members of the expedition, leaving the others there on the ground prosecuting their exploration and development work. This circumstance is significant, and lends plausible support to the assertion of Wilson and Hubbard.

Later in the year, and in the early part of 1898, assays were procured to be made by the members of the expedition of different pieces of rock brought home with them, and, among others, Wilson had an assay made in Spokane of the red colored rock handed him by Fernall, which showed it to carry gold in amount above $100 per ton. It is not clear whether the result of this assay was disclosed to all the other members of the association. It was undoubtedly made known to Hubbard and Kirby, but whether it was made known to the remaining four is questionable. It is quite probable that it was not. In the meanwhile there was much talk among the associates touching the organization of a third expedition, in which all the parties engaged more or less, Victor Wilson and G. M. Wilson appearing to be the most active. On January 22, 1898, Victor Wilson had an agreement in writing prepared looking to the development of the prospects theretofore discovered and located, describing the properties as follows:

"What has been described as the principal ledge, on which a twelve foot excavation has been made; the prospect about a mile and a half above said ledge, where the quartz is described as standing in pyramids above the ground, a sample from which assayed about $2.50, and which surrounds the head of the cove where the placer prospect was found, including said placer; the quartz prospect found by John Hubbard and Maurice Wilson, three or four miles down Trout creek from said principal ledge; the prospect on Little Trout, and the prospective ledge that we are to receive information in regard to from the man at Antelope."

The instrument was presented to several, if not all, of the associates, but no one ratified it by his signature. Kirby wrote Victor Wilson on February 10, 1898:

"I do not agree with your plan. However, if all of the old members agree to it, it will be all right with me. I do not have any objections to you or any of the boys taking in one or two or even three persons on their interest and make any agreement with them they see fit, provided they grant me the same privilege."

The unsigned agreement, while not binding upon any one, serves unmistakably to show the object and purposes for which the further and more definite arrangement was sought, and the letter of Kirby voices the antagonistic views entertained, although he expresses himself willing to sign if all the old members would likewise sign. It is significant that none of them did sign. The purpose was to develop mines then thought to be discovered, not to prospect for others or extend the exploration further than such as had formerly been made.

Later than this, the parties not being able to agree among themselves touching the further development of the mines discovered and in prospect, G. M. Wilson, John Hubbard, and Kirby, together with John Knight and O. W. Harkness, organized an expedition from Walla Walla for further exploration for mining prospects. Having the red quartz in mind because of its value as shown by the Spokane assay, they went directly to the Fernall place, and procured further directions from Fernall respecting the locality in which he discovered the rock. They were directed to a side hill in Mr. Friend's field. The prospectors were unsuccessful in their search in Friend's field, but, on extending it without some distance, they came upon a prospect that manifestly had been previously discovered, and which was subsequently claimed by one Brown, effectively so, as he later succeeded in establishing his prior right in court. Upon this prospect they located a claim, designating it the "Silver King." At the same time other claims, some nine or ten in number, were located upon the same ledge and within the immediate vicinity. Development work was prosecuted upon the "Silver King," and the ore found to be valuable. In the course of the following year the defendant corporation, the Oregon King Mining Company, was organized and took over the property, including all the claim locations that these parties made save one. While Wilson and his associates were prosecuting their development work upon the Silver King, Victor Wilson came into the country and claimed that he should have some interest in the claims located, and, by reason of the fact that he had been the original discoverer of mines in that section of the country, they withdrew their notice from one of their claims, the Le Roy, being an extension of another that was designated "The Bird," and posted a notice for Wilson, thus locating the same in his name and right. Victor Wilson subsequently treated this claim as his individual property, contracting with W. R. Baker to do and keep up the assessment work, for which service he agreed to give Baker a half interest in the mine. This was in July or August of 1898. Later, in the fall of 1899, or early in the year 1900, however, Victor Wilson began to set up a claim to an interest in the Silver King and the group of claims located with and about it. In August of 1900, notice of claim and interest in the property of the Oregon King Mining Company was posted, and on the 22d day of that month was filed with the county clerk of Crook county. This notice was subscribed by Victor Wilson, A. M. Kelso, A. J. Tash, and R. McGahey. In September, 1903, another notice was posted and filed by the same parties, claiming a four-sevenths

interest in the mine by right of association and understanding with the parties composing the Oregon King Mining Company in the prospecting which led to the location of the claim composing said company's property. The basis of their claim, therefore, as plaintiffs now insist, is the association agreement between the parties, entered into prior to entering upon the first expedition, as modified by the alleged agreement whereby Kelso and Hubbard were admitted new members of the association when entering upon the second expedition.

The entire controversy centers about the incident of Fernall's handing to G. M. Wilson the piece of red quartz rock, the information given by Fernall as to the locality in which he discovered it, and the further disclosure resulting from the Spokane assay that the rock was rich in gold. It is stoutly claimed that all this was information to which the entire association was entitled, and, having led to the discovery of the Oregon King mine, that all the members of the association should have their relative shares in the mine, along with other prospects that were discovered while on their expeditions in the year 1897.

Recurring to the agreement, the parties to the association were to share in all discoveries made. The expedition being prosecuted for the purpose of prospecting for mines, quartz in place was what they were hoping to find, although they came upon a placer prospect. That the mere coming into the possession of the red quartz rock, with the information received as to the locality in which it was picked up by the discoverer, was not a discovery of a mining prospect, is perhaps conceded by all. It required something more to amount to such a discovery as was within the intendment of the association agreement—some finding of the rock in place, or a ledge carrying the precious metals, valuable for mining purposes; so that the information obtained from Fernall was not a discovery.

It is charged that G. M. Wilson concealed his information relative to the red quartz rock from his associates, and what was subsequently obtained as to its value. I do not believe he concealed anything as to how he came into possession of the rock or what was told him by Fernall. The incident occurred while the party were on their way, upon their second expedition, to the place of their prior discoveries. The rock was thrown into the wagon, along with other specimens that had been and were being gathered as they extended their search, and was evidently seen and inspected by all then with the expedition. There had been no misunderstanding at the time, and Wilson had no apparent motive whatever in withholding any information that he might have gained. Indeed, it was not known, or even supposed, at the time that the rock was of any value, being of different appearance from anything that had previously been discovered, and in all likelihood the incident was remarked generally and all became possessed of whatever knowledge G. M. Wilson had on the subject. If there was any concealing of discovery and information, it must have occurred later. Wilson had an assay made of the rock, and thereby ascertained its value. Whether he disclosed this information to all of his associates, as previously remarked, is a matter in dispute.

There was an effort made to effect a reorganization of the associates for the purpose of developing the prospects previously discovered, but it was not thereby contemplated that there would be further prospecting done, save for a ledge of which information had been obtained from a man at Antelope. No agreement could be brought about for this purpose. Other rocks gathered on the expedition were assayed, and their values became common knowledge. Wilson claims that he talked with several of the parties about the assay he had made, and that there was no effort on his part at any concealment, but that in due time a new association was formed, having no connection with the old. It is probable that Wilson made no effort to have any member of the old association join the new save Hubbard and Kirby, as that would have been inconsistent with his act of withdrawing from the old association while upon the second expedition. He, Hubbard, and Kirby were more congenial than he and the other members of the association. But let it be conceded that Wilson did not make known to the other members the result of his assay, was that a matter of knowledge which, by legal intendment, should have inured to the benefit of all?

It is "well settled," says the court in Latta v. Kilbourn, 150 U. S. 524, 541, 14 Sup. Ct. 201, 207, 37 L. Ed. 1169, "that one partner cannot, directly or indirectly, use partnership assets for his own benefit; that he cannot, in conducting the business of a partnership, take any profit clandestinely for himself; that he cannot carry on the business of the partnership for his private advantage; that he cannot carry on another business in competition or rivalry with that of the firm, thereby depriving it of the benefit of his time, skill, and fidelity, without being accountable to his copartners for any profit that may accrue to him therefrom; that he cannot be permitted to secure for himself that which it is his duty to obtain, if at all, for the firm of which he is a member; nor can he avail himself of knowledge or information, which may be properly regarded as the property of the partnership, in the sense that it is available or useful to the firm for any purpose within the scope of the partnership business."

And it is further said in the same case, upon the authority of Lord Justice Lindley:

"That if a member of a partnership firm avails himself of information obtained by him in the course of the transaction of the partnership business, or by reason of his connection with the firm, for any purpose within the scope of the partnership business, or for any purpose which would compete with the partnership business, he is liable to account to the firm for any benefit he may have obtained from the use of such information; but if he uses the information for purposes which are wholly without the scope of the partnership business, and not competing with it, the firm is not entitled to an account of such benefits."

Now, allowing the association agreement the broadest scope that is possible under the terms claimed for it by the plaintiffs, which was to share and share alike in all discoveries of mining properties made upon the first and the following expedition (the agreement as to the latter having been modified only to allow of the admission of two additional members into the association), it could not include discoveries subsequently made by any one of the members of the association, or any different combination of some of such members. The scope of the agreement was necessarily limited to the two expeditions

that were to be and were subsequently made. It was a time limit, so that, when the expeditions were at an end, the right of all the members to share in the new discoveries of any member thereof, or of any new aggregation of part of its membership with others, was also at an end. The finding of this piece of red quartz which was picked up as float was not, as has been shown, a discovery of a prospect. The rock, being a float, did not indicate by the place where found the location of the ledge whence it came. The incident imparted at the furthest some information only that a ledge probably existed in that vicinity, but there was no discovery of a ledge. All the members of the association were put into possession of the knowledge of the finding of the piece of red quartz, and in all probability were informed of what Fernall said to Wilson as to the place or locality in which it was found, so that none were at a disadvantage by lack of knowledge pertaining to the incident during the prosecution of the two expeditions. No one of the members of the association was impressed with the value of the red rock, and it was by accident that an assay was suggested. The information came after the expeditions contemplated by the association agreement, both in its original and modified form, were at an end. The purposes of the expeditions being at an end, it is difficult to discover upon what ground the new information became association or partnership property. Furthermore, the use made of such information and knowledge for the purpose of further discovery was wholly without the scope, that is, beyond the time limit of the partnership or association business, and was not in competition with such business. The information was not even acquired upon a partnership transaction, nor from connection with the association, nor is its character such, in any view of the law, as belongs to the partnership in the sense of property which was valuable to the association and in which it had a vested right. If the information had come to light before the purposes of the association agreement had come to an end, a different question might have been presented, but, having come subsequently thereto, it cannot, in legal contemplation, be considered an asset of the association. Much less, therefore, can any developments proceeding therefrom by reason of further explorations and discoveries be considered such an asset.

It follows that the bill of complaint should be dismissed, and such will be the order of the court.