## BOULTON v. DITZ et al.

(Fourth Division. Fairbanks. January 3, 1918.)

No. 2209.

**Trusts ⬠72—Laches—Mines and Minerals.**

Plaintiff and defendants took an option to purchase a certain mining claim, agreeing to prospect the same on equal shares. Plaintiff having no funds, gave one of the defendants security for advances of his necessary share of the expense, beyond his labor. After considerable prospecting had been done by them, without success, the plaintiff declared his purpose to withdraw, and asked for and received the return of his securities, left the country, and abandoned the enterprise. Thereafter the defendants, and another, who subsequently joined them, continued prospecting and developed a valuable pay streak on the claim. Three years after the plaintiff had quit the enterprise, and after the defendants had located valuable pay on the claim, plaintiff brought suit to recover his former interest and for an accounting. *Held*, that by his abandonment of the enterprise the plaintiff lost all right to regain such interest, or to hold defendants as trustees therefor.

The plaintiff in this action seeks to compel the defendants to deed to him an undivided one-third interest in and to the Mascot Bench placer mining claim, located in the Nulato mining and recording district. There is a prayer that an accounting be had of the mining operations on the property and that the plaintiff recover one-third of the net profits.

The trial of this action was had at Ruby, by the court without a jury, and was completed on the 24th day of August, 1917. The case went to trial with Boulton as plaintiff and Ditz as defendant. At the close of the defendant's case it was apparent that Michael Selch was a necessary party defendant. Plaintiff's motion to make Selch a defendant having been granted, plaintiff was permitted to file his third amended complaint, making Ditz and Selch defendants. The defendants answered forthwith, inserting the necessary plurals and incorporating in their affirmative defense such matters as the evidence disclosed were permissible, in order that the allegations of the answer conform to the proof presented. The plaintiff forthwith filed an amended reply.

After argument had been had, and the case taken under

advisement by the court, plaintiff filed a motion to strike defendants' answer, on the ground that the amended answer contained matter changing the defense of the defendants after trial. This motion was filed nearly three weeks after the case was taken under advisement by the court; was not served upon either the plaintiff or his counsel, as far as any record in this court shows; was filed without permission of the court, and without asking permission to withdraw plaintiff's reply. In the first place, plaintiff's procedure is bad, and, in the second place, in the opinion of the court, the motion is without merit; but, in order that no precedent may be established by ruling on the merits of a motion filed under the circumstances above set forth, the motion will be stricken on the court's own motion.

The plaintiff, Boulton, is a prospector, and in a general way had looked over the Ruby camp prior to his meeting with the defendant, Ditz, at Ruby in June, 1912. He was practically without funds, and was anxious to have Ditz put up funds sufficient to enable him to secure an option to purchase mining property in the Ruby camp, and to prospect and develop any property thus secured. Ditz consented to entering into such an enterprise, put up $500, and immediately left for Hot Springs. Boulton secured an option on the Mascot Bench placer mining claim from Herbert Johnson, through Johnson's attorney in fact, Peter Jepson, paid down the sum of $250, and went to work on the property. Boulton testified that under the agreement the proceeds were to be divided half and half, and to the question, "And how were you to bear the losses?" He answered, "I suppose I would be held responsible for them for my half." The option was taken in the name of Ditz, regarding which Boulton testified:

"I thought it was nothing but right to put it in his name, being as I was looking to him to advance everything, and I thought it would be more security on that account."

Further testifying regarding the agreement, Boulton said:

"A. It was agreed there with me and him that he would advance everything. I told Mr. Ditz in the first place that I was broke, and I told him that he would have to finance the proposition through, and I would want a half interest before I would give it to him; that would be our oral agreement; and I agreed only to put in a couple

of months of my time on the ground, for I figured in two months we could show up the pay streak."

A short time after Boulton went to work on the property, he wired to Ditz at Hot Springs, and Ditz went to Ruby with an outfit to work the property. There is but little conflict in the testimony of Boulton and Ditz regarding this first agreement. Boulton's contention is that he was to work for a short period only, two months, and that, even if a pay streak was not struck by that time he was under no obligation to do any further work on the property, or incur any further expense. Ditz disputes any such agreement. I am unable to find that Boulton's contention is correct.

Michael Selch came to Ruby with Ditz and desired to become a partner in the enterprise. All three got together, talked the matter over, and it was decided that Selch was to become a partner with Boulton and Ditz. Ditz explains the agreement as follows:

"Well, the three now—each of the copartners buys a third interest and pays one-third expense of the prospecting, and that Selch and I advance for the prospecting, also advance the money for the purchase price of the claim, and Boulton's interest comes out of the claim; and we all have to stay on the ground until we find out whether there is any pay there or not."

Boulton's reason for having the option in Ditz's name was so that it would be more security to Ditz, because Ditz was advancing everything. I have no doubt about all three partners acting in good faith as long as they were prospecting the property. Boulton seems to have realized that he was liable for one-third of the expense, and since Ditz was advancing for him he wanted to give him some security. In September he got one Campbell to give Ditz a deed for some property on Monument creek and Ophir creek, saying:

"I give you my interest in Monument creek—the association—and one on Ophir creek, as security for the money that you pay out for my expenses and prospecting."

Ditz took the deed. The three industriously prospected the claim during the winter of 1912–1913, put down 10 holes, and in the eleventh hole at a depth of 40 feet struck water. The expense incurred up to this time—February, 1913—was about $2,000. When they struck water, Ditz testifies that

Boulton said that that was his finish and that he had got enough. Boulton claims that he was willing to keep on working, but that Ditz and Selch would not continue. Everything goes to show that Boulton had made up his mind to abandon the enterprise, and his story that he wanted to keep on working on the claim cannot be accepted as correct.

Matt Buckley, a witness for the defendants, testified that Boulton offered to sell all his interests in that district for $300. To Herman Wilks, in speaking of the Mascot Bench, Boulton said he was out of it and had nothing more to do with it. A similar statement was made to Frank Smith, another witness for defendants. In vulgar language, he expressed his opinion of the property to Ditz, Selch, and Bert Walker, who afterwards became interested in the property. Ditz and Selch went to work on the Shy Anne, an adjoining claim, and Boulton worked for one Alex Larson. In June, 1913, Boulton got the deed back that he gave to Ditz for security. He testified that there was a chance to sell the property, and that he and Campbell divided the proceeds of the sale equally. On the subject of the surrender of the deed, Ditz testified as follows:

"Q. After February, 1913, did you see Boulton again that summer? A. Yes, sir. Q. About what time? A. I suppose in June. Q. Where did you see him? A. Well, Boulton came up in June— I couldn't exactly say the date—and he told me, if I give him back the deed or bill of sale of Monument Creek, he would give me his interest in the cabin, tools, the prospecting boiler, and everything, if I release him of all his indebtedness to me. Q. Did he say what he could do with that Monument property? A. Yes; he wanted to sell it. Q. He said he had an offer? A. Yes, sir. Q. Did he say how much? A. I think he said $400 at the time. Q. What did you do, if anything? A. And I gave him the bill of sale, and. I asked him: 'You are satisfied to give me a bill of sale, so I can show.' He says: 'That is not necessary.' Q. What did you want a bill of sale for? A. For the cabin and everything, the boiler. He said: 'It is not necessary.' His name didn't appear in any papers. 'And we have never left any papers out, so I don't see that I have anything to sell.'"

Boulton soon left that section of the country and went on a stampede to the Shushanna country, and never returned to Ruby until the trial of this case in August, 1917. On the 10th of July, 1915, Boulton wrote a letter to Ditz (Defendant's Exhibit No. 2), in which, among other things, he said

he thought he was entitled to something; that he was not in good health and wanted to go outside. Further he writes:

"Now, Ditz, I am practically down and out, and you could help me considerably by sending me $1,000 and not miss it. You know, Ditz, this world is pretty small, and a friend is a good deal better than an enemy."

Questioned on cross-examination as to this statement, and if his purpose was the purpose stated in the letter, Boulton said, "Might have wanted a few more after that."

In the original option for the purchase of the Mascot Bench, the payments were to be made as follows: $250 on the signing of the instrument, dated July 19, 1912; $2,000 September 15, 1912; and $5,750 August 1, 1913. On March 31, 1913, more than a month after Boulton said he was through with the ground, Ditz secured an "extension of option," reciting therein that an option had been given as above, and that, although much prospecting had been done, there had been a failure to find gold in paying quantities. Payments were provided for in the following language:

"The payment of two thousand dollars ($2,000.00) shall become due and payable on or before the 1st day of October, A. D. 1913: Provided that, if the party of the second part has not, by that time, succeeded in locating gold on the said claim in paying quantities, then the said date of payment of the said two thousand dollars ($2,000.00) shall, without any further act on the part of either of the parties hereto, be further extended until the 15th day of June, A. D. 1914.

"The payment of five thousand seven hundred and fifty dollars ($5,750.00) shall become due and payable on or before the 15th day of September, A. D. 1914, instead of the 1st day of August, A. D. 1913."

It was not until the month of November, 1913, that Walker became interested in the property with Ditz and Selch. With a Keystone drill about 30 holes were put down and the property was found to be valuable. The payments specified in the "extension of option" were made and each of the three parties, Ditz, Selch, and Walker, became the owner of an undivided one-third interest in the property. The charges made by Boulton that Ditz and Selch had acted fraudulently in their dealings with him are wholly unsubstantiated. I have no doubt Boulton many times wished he had stayed

with the venture, but this is one of the vain regrets so frequent in every mining camp.

Guy B. Erwin, of Fairbanks, for plaintiff.

Henry Roden, of Juneau, and A. R. Heilig, of Portland, Or., for defendants.

BUNNELL, District Judge. Counsel for plaintiff have submitted an instructive brief on the several subjects of co-tenancy, partnership, specific performance, equitable mortgagor and mortgagee, cestui que trust, trustee ex maleficio, and principal and agent. Generally I agree with the law submitted, but I am unable to find that it can or should be made applicable to the facts in this case. It would be, indeed, a strange state of affairs if Boulton, having entered into a mining venture, such as the evidence discloses this was, and, after having declared that he was done, and would have nothing more to do with it, selling his personal effects, surrendering any and every interest he had in the venture, to get back the security he had given, as between himself and Ditz and Selch getting released of all liability for expenses incurred, and leaving the country, could three years later come back and say to Ditz and Selch: You are my trustees. Account to me for what you have done.

Particular stress has been placed upon the fact that Ditz was advancing Boulton's share of the expense in prospecting the property, and that Ditz was to be reimbursed from the proceeds of the property if operations were successful. This contention could only prevail in the event Boulton stayed with the venture until proceeds were available. He declared himself out, quit, and, besides thus abandoning the venture, received back from Ditz the security he had given for one-third of the expenses. It seems almost impossible to state a case where the abandonment of a venture, both by intent expressed and acts in furtherance thereof, could be more complete. Counsel ingeniously argues that putting down 11 holes and not finding the pay streak goes to the development of the property, because in subsequent work it would be unnecessary to further prospect at these points. In Alaska, as in all mining districts, it has been the finding of the pay streak that counts. Counsel's argument is without merit.

The general principles of equity and law applicable to this case, set forth in McGahey v. Oregon King Mining Co. (C. C.) 165 Fed. 86, Cameron v. Burnham, 146 Cal. 580, 80 Pac. 929, Larsh v. Boyle, 36 Colo. 18, 86 Pac. 1,000, 27 Cyc. 763, and R. C. L. 927, 938, are recognized.

The order of the court is that the bill of complaint should be and is dismissed.

---

⊗═See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes