# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 45
Batavia Townhouses, Ltd., et al.,
　　　　Respondents,
　　　v.
Council of Churches Housing
Development Fund Company, Inc.,
　　　　Appellant.

William E. Brueckner, for appellant.
Steven D. Gordon, for respondents.

TROUTMAN, J.:

The primary question presented by this appeal is which section of article 17 of the

General Obligations Law governs the tolling or revival of the statute of limitations period

in an action pursuant to Real Property Actions and Proceedings Law (RPAPL) § 1501 (4).

- 1 -

RPAPL § 1501 (4) allows a party to cancel a mortgage where the limitations period for commencing a foreclosure action has expired.  We hold that General Obligations Law section 17-105, not section 17-101, governs whether the statute of limitations has been tolled or revived in such an action.

Defendant Council of Churches Housing Development Fund Company (Council) borrowed approximately $4.7 million in 1971 to develop and operate Birchwood Village Apartments (Birchwood).  Council defaulted on the private loan in 1979, which was insured by the U.S. Department of Housing and Urban Development (HUD).  Upon Council's default, HUD acquired the note and associated mortgage on Birchwood.  With HUD poised to foreclose on the property, Council subsequently formed plaintiff Batavia Townhouses, Ltd. (the Partnership) to bring in a cash infusion from private investors.  Council is the managing general partner of the Partnership, which also currently has two limited partners:  plaintiffs Arlington Housing Corp. and Batavia Investors, Ltd.  The Partnership bought Birchwood from the Council in 1979 for $5.5 million and executed a wraparound note and mortgage (wraparound mortgage) in that amount in favor of Council.  From 1979 to 2012, the Partnership used income from Birchwood to make payments to Council on the wraparound mortgage, and Council used those funds to pay off the HUD mortgage on the property, which was fully satisfied in February 2012.  The Partnership's wraparound mortgage, the only remaining encumbrance on Birchwood, matured on March 1, 2012.  The Partnership made no further payments on that debt for the next seven years, and Council did not commence any foreclosure proceedings.

In May 2019, the limited partners brought this derivative action, on behalf of the Partnership, against Council seeking a declaration that the wraparound mortgage was unenforceable because the six-year limitations period for foreclosure had expired in March 2018. Council responded that the statute of limitations had been tolled under General Obligations Law §§ 17-101 or 17-105 because the Partnership's annual financial statements and tax returns for 2012 to 2018 listed the mortgage as an outstanding liability. Section 17-101 provides that an "acknowledgment" of a contractual debt is "competent evidence of a new or continuing contract" that tolls the limitations period for commencing actions "other than an action for the recovery of real property." Section 17-105 (1) states, "A waiver of the expiration of the time limited for commencement of an action to foreclose a mortgage of real property . . . or a promise to pay the mortgage debt . . . by the express terms of a writing signed by the party to be charged is effective . . . to make the time limited for commencement of the action run from the date of the waiver or promise." Supreme Court, among other things, granted plaintiffs' motion for summary judgment seeking to cancel and discharge the wraparound mortgage. As is pertinent, the court ruled that the action to foreclose on the mortgage was time barred pursuant to CPLR 213 (4) and the six-year statute of limitations was not tolled or revived under General Obligations Law § 17-105.

The Appellate Division modified the Supreme Court order insofar as appealed from by remitting the matter to Supreme Court for the grant of an appropriate judgment declaring the rights of the parties and otherwise affirmed. The court agreed with Supreme Court that

only General Obligations Law § 17-105 (1) "applies to the type of action brought here under RPAPL § 1501 (4), which requires the party bringing such an action to establish that the limitations period for the commencement of a mortgage foreclosure action has expired" (189 AD3d 20, 25 [2021]). The Court reached that conclusion based on the "plain language" and legislative history of sections 17-101 and 17-105 (*id*. at 25-26). The Court explained that, although section 17-101 allows a "mere 'acknowledgment' " to extend the statute of limitations for "contractual debts," section 17-105 (1) "was enacted specifically to address the waiver of the statute of limitations applicable to mortgage debt and . . . provided that an express promise to pay such debt . . . would be sufficient to revive the otherwise expired statute of limitations" (*id*.). As a result, the Appellate Division unanimously concluded that the Partnership's financial statements and tax returns could not revive the limitations period because they "do not constitute an express promise to pay the mortgage debt" (*id*. at 28). We granted leave to appeal (36 NY3d 906 [2021]), and we now affirm.

In pertinent part, RPAPL § 1501 (4) provides as follows:

> "Where the period allowed by the applicable *statute of limitation for the commencement of an action to foreclose a mortgage*, or to enforce a vendor's lien, *has expired*, any person having an estate or interest in the real property subject to such encumbrance may maintain an action against any other person or persons, known or unknown, including one under disability as hereinafter specified, to secure the cancellation and discharge of record of such encumbrance, and to adjudge the estate or interest of the plaintiff in such real property to be free therefrom" (RPAPL § 1501 [4] [emphasis added]).

Thus, a party seeking to cancel or discharge a mortgage must first establish that the limitations period for enforcement by way of foreclosure has already expired. Here, it is undisputed that the six-year statute of limitations to foreclose on Birchwood expired on March 2, 2018, pursuant to CPLR 213 (4), unless it was extended or revived by one of the means set forth in either General Obligations Law §§ 17-101 or 17-105. The question we must answer is whether both or only one of those sections of the General Obligations Law applies here.

Despite what Council contends, General Obligations Law § 17-105, by its express terms, is the sole statute governing the tolling or revival of the statute of limitations for an action to foreclose a mortgage. Section 17-105 (1) states that, among other things, a "promise to pay the mortgage debt, if made *after the accrual of a right of action to foreclose the mortgage* . . . by the express terms of a writing signed by the party to be charged is effective . . . to make the time limited for commencement of the action run from the date of the . . . promise" (emphasis added). The statute further states that "[e]xcept as provided in subdivision five, no acknowledgment, waiver or promise has any effect to extend the time limited for commencement of an *action to foreclose [a] mortgage* for any greater time or in any other manner than that provided in this section, nor unless it is made as provided in this section" (§ 17-105 [4] [emphasis added]). Moreover, section 17-101 excludes itself—and by implication its allowance for a mere acknowledgment to toll or revive the statute of limitations—because it indicates that it does not apply to "actions for the recovery of real property."

Council further argues that General Obligations Law §§ 17-101 and 17-105 both apply to mortgage foreclosure actions based on this Court's precedent in *Petito v Piffath* (85 NY2d 1 [1994]), in which we considered both statutes in concluding that a time-barred foreclosure had not been revived. However, *Petito* is distinguishable from the present case because the record in that case reveals that, unlike the present case, the parties did not present this Court with the threshold question of which section of the General Obligations Law applied in a mortgage foreclosure action.

Under General Obligations Law § 17-105 (1), the Partnership's actions in this case could only toll or revive the statute of limitations for the Council to bring a foreclosure action if the Partnership made an "express" "promise to pay the mortgage debt." Accordingly, the Appellate Division correctly concluded that the Partnership's delivery of its financial statements and tax returns to Council did not meet the requirements of section 17-105 (1) because they were not express promises to pay the mortgage debt (189 AD3d at 28).[1]

Council seeks, however, to draw a distinction between an "express promise" and General Obligations Law § 17-105 (1)'s requirement of a "promise . . . made . . . by the express terms of a writing." According to Council, a mere acknowledgment meets that requirement. Section 17-105 (1), however, does not use the word "acknowledgement,"

---

[1] Because we conclude that General Obligations Law § 17-105 (1) governs the tolling or revival of the statute of limitations for an action pursuant to RPAPL § 1501 (4), we have no occasion to decide whether the Partnership's delivery of its financial statements and tax returns to Council constituted "acknowledgment[s]" under General Obligations Law § 17-101.

and it instead refers to a "promise" or "waiver" made "by the express terms of a writing." The logical reading is that, whereas section 17-101 allows for a written and signed "acknowledgement [of] or promise" to pay a contractual obligation to toll or revive the statute of limitations, section 17-105 (1) requires the mortgage debtor to make an "express" "promise to pay the mortgage debt." To instead construe the word "promise" to refer both to an "acknowledgement" and a "promise" would render meaningless the distinction between an "acknowledgment or a promise" made in section 17-101. Treating an "acknowledgment" as being something different than a "promise" abides by the rule of statutory construction that "[w]hen different terms are used in various parts of a statute or rule, it is reasonable to assume that a distinction between them is intended" (*Matter of Albano v Kirby*, 36 NY2d 526, 530 [1975]). Additionally, section 17-105 (4)'s statement that outside of the provisions of that section "no acknowledgment, waiver or promise has any effect to extend the time" indicates that the legislature didn't intend for a mere acknowledgment to revive or toll the statute of limitations for a foreclosure action.

The legislative history further demonstrates that the purpose behind General Obligations Law section 17-105 was to require more express actions by a mortgage debtor to toll or revive the statute of limitations so as to prevent "[s]erious impairment of titles to land and hindrance of real property financing" (1961 Law Rev Commn., Acts, Recommendation and Study Relating to Transaction Affecting the Time Limited for an Action to Foreclose a Mortgage of Real Property at 112). It would conflict with that legislative intent to allow an acknowledgment (*i.e.*, an implied promise), as opposed to an

express promise, to toll or revive the statute of limitations for a mortgage foreclosure action. Council's remaining arguments are lacking in merit.[2]

Accordingly, the order of the Appellate Division should be affirmed, with costs.

---

[2] The partial dissent's analysis addresses arguments that were neither preserved for review by any party nor raised in this Court (*see Misicki v Caradonna*, 12 NY3d 511, 518-520 [2009]). Although the parties dispute which tolling provisions apply (and what they require), there is no suggestion that the note and mortgage could or should be treated separately for tolling purposes. Indeed, in its brief, Council repeatedly suggests just the opposite, directing its tolling arguments to the enforceability of "the WrapAround Note and Mortgage," also referred to as the "mortgage obligation" (App Br at 11, 26, 29). Council does not contend that a triable issue of fact precluded summary judgment but, to the contrary, noted that the parties "agreed that the matter is appropriate for resolution by summary judgment" (App Br at 11).

WILSON, J. (dissenting in part):

There are actually three classic blunders: only slightly lesser known than "never get involved in a land war in Asia" is "never get involved in a tax shelter deal in Batavia." We

should heed that advice and leave the core issue for resolution in the prior pending federal litigation.

I

To understand the heart of this dispute, it is important to pay close attention to the corporate structures of and relationships among the parties involved in this lawsuit and the underlying transactions. That requires some exposition, but the bottom line is that the interrelated plaintiffs–respondents, Arlington Housing Corporation and Batavia Investors, Ltd., invested in a low-income apartment complex, Birchwood Village, as a tax shelter and have received tax breaks for their investment for the past forty years. Their investment had two parts: a $400,000 cash investment and a promise that the partnership generating their tax losses (of which they were a part) would pay a $5.5 million dollar loan to the creator and operator of Birchwood Village.

That tax shelter was set to expire in December 2020, so the investors decided to try to have their cake and eat it too: they tried to take control of Birchwood Village without paying the promised $5.5 million loan plus accumulated interest. The Council of Churches Housing Development Fund Company, Inc. ("Council of Churches"), the defendant–appellant in this lawsuit, developed and operates Birchwood Village and is trying to defend itself from that takeover in a separate lawsuit, which was filed before this one and is currently pending in federal court (*see Council of Churches Hous. Dev. Fund Co., Inc. v Arlington Hous. Corp.*, 18-CV-6920 CJS, 2019 WL 1970517 [WDNY May 3, 2019]). In that lawsuit, the investors claimed that Council of Churches breached its fiduciary duty to

the investors by not charging high enough rents to the tenants of Birchwood Village. The federal court denied the investors' motion for a preliminary injunction on the ground, *inter alia*, that they were not likely to succeed on the merits.

The derivative lawsuit in our court may seem ancillary—the question is whether the applicable statute of limitations on the note or mortgage has been revived—but that dispute is interwoven with the federal litigation. A detailed understanding of the underlying facts in the record informs the correct resolution of this case.

A

Fifty-two years ago, in 1970, a group of churches formed the Council of Churches Housing Development Fund Company, Inc. ("Council of Churches") as a not-for-profit organization with the mission of developing and operating, on a non-profit basis, a housing complex in Batavia, New York for persons with low income. One year later, to finance the development of that apartment complex, Birchwood Village ("Birchwood"), Council of Churches borrowed $4.7 million from a private lender.

That $4.7 million loan was evidenced by a promissory note—that is, a written promise that Council of Churches would pay back the borrowed money to the lender under specific terms and conditions—and secured by a mortgage—that is, an agreement that gave the lender the right to take the actual property of Birchwood Village if Council of Churches failed to repay the money it borrowed on the schedule provided for. The United States Department of Housing and Urban Development ("HUD") guaranteed the loan, in exchange for which Council of Churches promised to operate Birchwood Village in

compliance with certain HUD regulations, including restricting use of the apartment complex to families with low or moderate income.  Council of Churches built and operated Birchwood Village as it had intended from the start and as it had promised HUD.

Birchwood faced financial difficulties, however.  Eight years later, in 1979, Council of Churches defaulted on the loan, at which point HUD, pursuant to its guarantee, paid off the private lender and acquired the note and associated mortgage.  But Birchwood continued to have financial difficulties and Council of Churches was still unable to make the mortgage payments, now due to HUD.

Then, plaintiff–respondent Batavia Investors, Ltd. ("Investors") entered the picture. It proposed to HUD that the ownership of Birchwood change to bring in private investors. The benefit was twofold: Birchwood would receive an influx of cash ($400,000) from Investors to make needed repairs and improvements, and Investors would be able to use Birchwood as a tax shelter.

In general, the amount of taxes a business must pay in a given year is based on how much money it made that year.  If a business has expenses or losses, it can subtract them from the amount of money it made, which in turn reduces the amount of taxes it owes.  If the business is structured as a partnership, the business's losses are passed through to the partners as individuals, who can use those losses to offset income they've earned elsewhere, thus reducing their tax liability.

Here, the idea was that the apartment complex, Birchwood Village, would operate at a loss and provide a tax shelter for private investors (*see Council of Churches*, 2019 WL 1970517, at *6).  The way it would work is that a private investor would invest money in,

and own part of, Birchwood, and then it could use Birchwood's operating losses to count against profits it made in other ways, which would reduce how much taxes it would owe. The private investors who ended up using Birchwood as a tax shelter are the plaintiffs–respondents in this lawsuit: Arlington Housing Corporation ("Arlington") and Investors (together, the "Limited Partners").

To execute the plan of turning Birchwood into a tax shelter, the parties created a new legal entity: the "Partnership," which was formed as a limited partnership in 1978 under the laws of the District of Columbia with Investors, then known as "Essex, Ltd.," as the sole limited partner of the Partnership[1] (*id.* at \*1). One year later, Council of Churches sold Birchwood to the Partnership in exchange for a $5.5 million note—a written promise to pay a debt—secured by a mortgage—an agreement that Council of Churches could take Birchwood from the Partnership if it defaulted on the debt (*id.*). That note and mortgage were "wrapped around" the HUD mortgage, which was still encumbering the property (*id.*).

As part of the transaction, the Partnership's Partnership Agreement was altered with five important changes. First, the Partnership was given the name it has today: Batavia Townhouses, Ltd. Second, Council of Churches joined the Partnership as managing general partner; a Mr. David C. Green, who had construction and rehabilitation expertise, was the Partnership's second general partner. Third, the Partnership Agreement provided that the Partnership would automatically dissolve on December 1, 2020. Fourth, Investors, still then known by its former name of Essex Ltd., continued to be the sole limited partner

---

[1] Investors itself is organized as a limited partnership.

and, pursuant to the Partnership Agreement, made a one-time contribution of $400,000 to the Partnership. Finally, the Partnership Agreement made clear that the point of the Partnership was to operate Birchwood as a tax shelter:

> "The sole purpose and business of the Partnership shall be to acquire real property . . . and to own, hold, manage, maintain, and operate thereon . . . as may be necessary, advisable, or convenient to the promotion or conduct of the business of the Partnership . . . *and insofar as is consistent therewith, will maximize the Federal, state and local income tax benefits available to the Partnership*" (emphasis added).

To make sure that the operating losses that supported the tax savings went to the investors wanting to use Birchwood as a tax shelter, the Partnership Agreement allocated 99% of the Partnership's property, profits, and losses to its limited partners.[2]

---

[2] The parties ensured the Limited Partners' tax shelter as follows: the Partnership promised to pay the $5.5 million dollar note to Council of Churches and the Partnership Agreement allocated 99% of the "profits" (losses, really) to the Limited Partners. The Partnership Agreement provided that the Limited Partners would not be personally liable for the debts of the Partnership, which allowed the Limited Partners to claim losses of up to $5.9 million, though only contributing $400,000 in cash. This is because

> "[a] partner may not deduct his share of partnership losses below his basis in his partnership interest. A partner's initial basis in his partnership interest is the amount of money he contributes to the partnership, plus the adjusted basis of any property he contributes. However, the [Internal Revenue] Code specifically provides that a partner shall be treated as having contributed additional money to the partnership to the extent he shares in partnership liabilities. Under the Treasury Regulations . . . the limited partners may share in partnership liabilities for basis purposes, but are only deemed to share in those liabilities that are fully non-recourse as to the partners and to the partnership. Such non-recourse liabilities are automatically shared by the limited partners in the same proportion they share in profits. The effect is that limited partners may deduct partnership losses far in excess of their

In 1981, Mr. Green withdrew as the Partnership's second general partner, and he was replaced by plaintiff–respondent Arlington. Arlington's president, Mr. Lawrence F. Penn, was also the president of Investors's general partner. Council of Churches remained the managing general partner, and Investors remained a limited partner.

Twenty years later, in 2001, Council of Churches received a memorandum from HUD advising that HUD had entered into a settlement agreement with Mr. Penn pursuant to which he and his associated entities were to divest from all interests in HUD properties; the settlement agreement resolved outstanding criminal, civil, and administrative charges involving Mr. Penn, HUD and the United States Department of Justice. Because Birchwood Village was a HUD property, Arlington was not permitted to continue as general partner. Arlington was permitted, however, to participate as a limited partner, and the Partnership Agreement was amended in 2004 to reflect this change in capacity from general to limited partner.

To recap, the Partnership, now called Batavia Townhouses, Ltd., is now made up of one managing general partner, defendant–appellant Council of Churches, and two limited partners, plaintiffs–respondents Arlington and Investors, which brought this derivative suit on behalf of the Partnership. For the past forty years, Council of Churches has operated Birchwood consistent with its mission to provide low-income housing and consistent with

---

cash and property investment in the partnership" (Donald J. Weidner, Realty Shelter Partnerships in a Nutshell, 8 Indiana L Rev 899, 901 [1975]).

the Partnership Agreement's mandate to generate operating losses that create tax savings for the limited partners.

For reasons that will become clear later, it also is important to mention that every year since 2000, the Partnership has prepared and distributed to its partners, both general (Council of Churches) and limited (Arlington and Investors), written financial statements prepared by the Partnership's independent certified public accountants under a signed auditor's report, most recently in April 2019.  Those financial statements include balance sheets that reflect the 1979 wraparound note and mortgage as a liability of the Partnership. The Partnership also prepared, filed, and distributed to Council of Churches its annual tax returns, which reflect the mortgage obligation and were signed by the Partnership's executive director, who oversees the daily operation of Birchwood.

B

The genesis of the parties' dispute begins about ten years ago.  In 2012, the Partnership made the final payment on the note held by HUD, on schedule.  After that, the only encumbrance on the property was the $5.5 million note (plus accumulated interest) and associated mortgage executed by the Partnership in favor of Council of Churches in 1979.  But, for reasons that are not clear from the record, the Partnership never made any payments to Council of Churches in connection with the wraparound note and mortgage, even though monthly payments were due.  As a result, interest accumulated on the note, on top of the unpaid balance.

The relationship between Council of Churches and the Limited Partners subsequently deteriorated.  In November 2018, the Limited Partners attempted to remove Council of Churches "for cause" as managing general partner of the Partnership.  The next month, Council of Churches filed a lawsuit in federal court seeking, among other things, a preliminary injunction barring the Limited Partners from assuming control of the Partnership and a declaration that Council of Churches did not violate the Partnership Agreement.  In response, the Limited Partners filed an answer with counterclaims, alleging that Council of Churches breached its fiduciary duty by keeping rents at Birchwood too low to pay back the wraparound note and mortgage.  The Limited Partners also sought an injunction to enforce their removal notice to Council of Churches.

The federal lawsuit was filed in late 2018, not long before the Partnership was set to expire automatically on December 1, 2020 pursuant to the Partnership Agreement.  Upon the dissolution of the Partnership, the Limited Partners would face income tax liability.[3]

In February 2019, while litigation in federal court was ongoing, Council of Churches's Board of Directors adopted a resolution stating that Council of Churches, as

---

[3] *See Council of Churches*, 2019 WL 1970517, at \*7 & nn 31, 33; *see also id*. at n 32 ("[I]n 2014 Penn acknowledged that one of the reasons he wanted to sell Birchwood Village was because the limited partners would have 'federal tax liability . . . due to their recapture of their negative capital accounts from the Partnership").  Upon the dissolution of the Partnership, its assets—Birchwood Village—would be conveyed to Council of Churches in satisfaction of the Partnership's debt obligation.  Upon the Partnership's conveyance of Birchwood Village back to Council of Churches, the Partnership, for tax purposes, would have been treated as having gained the fair market value of Birchwood—which, in the federal lawsuit, was estimated to be $6.8 million (*see Council of Churches*, 18-CV-6920 CJS, 2019 WL 1970517, Dkt No 17 ¶ 22 [Declaration of CPA Douglas Zimmer in Support of Council of Churches of Jan 29, 2019]).

holder of the wraparound note and mortgage, demanded that the Partnership "resume monthly debt service payments of interest on the Note & Mortgage." Thereafter, the Partnership, which was operated by Council of Churches as general partner, began making the requested monthly payments to Council of Churches, the holder of the note and mortgage, which eventually totaled $330,000.

C

The Limited Partners then filed this derivative lawsuit on behalf of the Partnership, seeking "declaratory relief that a note and mortgage . . . made by the Partnership and held by defendant Council of Churches Housing Development Fund Company, Inc. . . . , which is the general partner of the Partnership is unenforceable." They alleged that the six-year limitations period for enforcing the wraparound note and mortgage expired on March 1, 2018, at which time they became unenforceable. Council of Churches acknowledged that the six-year statute of limitations set forth in CPLR 213 (4) generally applied to the enforceability of the wraparound note and mortgage, and that the note matured on March 1, 2012. Council of Churches, however, argued that the statute of limitations did not expire on March 2, 2018 because it was tolled under either section 17-101 (which requires an "acknowledgment or promise contained in writing signed by the party to be charged" to toll the limitations period) or section 17-105 of the General Obligations Law ("GOL") (which requires "a promise to pay the mortgage debt . . . either with or without consideration, by the express terms of a writing signed by the party to be charged" to toll the limitations period). Specifically, Council of Churches argued that the Partnership's

transmission to Council of Churches of the Partnership's financial statements and tax returns constituted a written acknowledgment of the obligation and/or promise to pay sufficient to toll the statute of limitations under either provision. Council of Churches also argued that the Partnership's payments to Council of Churches in response to its February 2019 demand for payment reflected an intent to honor the note and mortgage.

Supreme Court granted the Limited Partners' cross-motion for summary judgment. It ordered that "the WrapAround Note and Mortgage" were "cancel[ed] and discharge[d]"; that Council of Churches must "restore to the Partnership all mortgage loan payments that it has collected pursuant to the February 7, 2019 resolution"; and that Council of Churches's "actions, subsequent to the expiration of the statute of limitations on March 3, 2018, to re-commence payments on the WrapAround Note and Mortgage (starting in February 2019) are invalid and are hereby set aside" (2019 NY Slip Op 34037[U], 13 [N.Y. Sup Ct, Genesee County 2019]).

First, Supreme Court held that the limited partners "made 'a prima facie showing of [their] entitlement to judgment as a matter of law by establishing that the subject mortgage is unenforceable since . . . the six-year limitations period for the commencement of an action to foreclose the mortgage expired" (*id*. at 6, quoting *Deutsche Bank Natl. Tr. Co. v Lee*, 60 Misc 3d 171, 175 [Sup Ct 2018]).

Next, Supreme Court considered whether Council of Churches had demonstrated that the statute of limitations was tolled under section 17-101 or 17-105 of the GOL. Initially, the court determined that "[b]ecause the WrapAround Note and Mortgage is a mortgage of real property, the issue whether it has been tolled or revived is not governed

by GOL §17-101" because "[s]ection 17-101, by its explicit terms, is inapplicable to actions for the recovery of real property" (*id.*). Thus, Supreme Court concluded that section 17-105 was the correct provision to apply and that the financial statements "d[id] not constitute a promise to pay the debt" and therefore the limitations period was not tolled by the financial statements (*id.* at 9). The court also went on to add that the financial statements were "insufficient . . . to constitute even an 'acknowledgment' of the debt," which would have tolled the limitations period under section 17-101 (*id.*). Supreme Court declined to consider whether the tax returns constituted either an acknowledgement in satisfaction of section 17-105 or an acknowledgement in satisfaction of section 17-101.

Finally, Supreme Court determined that the payments made pursuant to the February 2019 resolution did not revive the statute of limitations pursuant to GOL § 17-107 because the payments constituted a breach of fiduciary duty (*id.* at 12-13).

The Appellate Division modified the order to require Supreme Court to grant the Limited Partners the declaration they requested and, as so modified, affirmed (189 AD3d 20 [4th Dept 2020]). First, the Appellate Division agreed with Supreme Court that section 17-105, not section 17-101, applied in this case (*id.* at 27-28). After determining that section 17-105 applied, the Appellate Division held that the financial statements delivered to Council of Churches did "not meet the requirements of subdivision (1) of [that statute] because those documents merely list[ed] the mortgage as a liability and d[id] not constitute an express promise to pay the mortgage debt" (*id.* at 28). The court noted that Supreme Court erred in failing to consider the tax returns, but determined that "even when properly considered, the tax returns merely reflect[ed] that [the] Partnership had unspecified

nonrecourse loans on its balance sheets and d[id] not constitute an express promise to pay the mortgage debt" (*id.*).  Finally, the court held that Supreme Court correctly determined that the payments made pursuant to the February 2019 resolution were "void ab initio because [Council of Churches's] actions to recommence payment on the mortgage . . . constituted a breach of fiduciary duty" (*id.*).

In its analysis, the Appellate Division mischaracterized the relief sought in the complaint; the Appellate Division characterized the Limited Partners as seeking "a judgment declaring pursuant to RPAPL 1501 (4) that the mortgage is unenforceable on the ground that the limitations period for enforcement thereof had expired," whereas the complaint actually seeks "declaratory relief that a note and mortgage . . . made by the Partnership and held by defendant Council of Churches Housing Development Fund Company, Inc. . . . , which is the general partner of the Partnership is unenforceable."  The complaint makes no mention of RPAPL 1501 (4).

Upon Council of Churches's motion, we granted leave to appeal (36 NY3d 906 [2021]).


II

At issue in this case is *both* a note and a mortgage.  Supreme Court, the Appellate Division, and the majority err by treating the note and mortgage as if they were one instrument.  They are two, with different characteristics, and different governing provisions under the General Obligations Law.

Regarding the mortgage, I agree with Supreme Court, the Appellate Division, and the majority that GOL § 17-105 "is the sole statute governing the tolling or revival of the statute of limitations for an action to foreclose a mortgage" and that "the Partnership's delivery of its financial statements and tax returns to Council [of Churches] did not meet the requirements of section 17-105 (1) because they were not express promises to pay the mortgage debt" (majority op at 5-6). In practical terms, that means that Council of Churches has lost the ability to institute a foreclosure action.

But I dissent because the lower courts should have separately considered the note under the different statutory limitations period applicable to it. A note is a distinct instrument that provides distinct rights and remedies. A note, even if made to finance the acquisition of real property, need not be accompanied by a mortgage (*see, e.g.*, *Transbel Inv. Co. v Venetos*, 279 NY 207, 209 [1938]). A note is a special form of a contract to pay money: a negotiable instrument that can be enforced pursuant to its terms, irrespective of the existence or validity of any mortgage (*see*, *e.g.*, *CitiMortgage, Inc. v Ramirez*, 192 AD3d 70, 72 [3d Dept 2020] [allowing plaintiff bank's action seeking a money judgment in the amount of the unpaid balance of a note after its separate foreclosure action was dismissed as time-barred]). To that end, I conclude that GOL § 17-101 governs the limitations analysis for a note.

The majority's assertion that the application of GOL § 17-101 was "neither preserved for review by any party nor raised in this Court" (majority op at 8 n 2) is belied by the record. During argument on the cross-motions for summary judgment, Supreme Court asked counsel to discuss "the interplay between Section 17-101 of the General

Obligations Law and Section 17-105 of the General Obligations Law." Counsel for Council of Churches responded that "17-101 . . . was made applicable in all actions other than a mortgage foreclosure action" and that "this isn't a foreclosure. This is an effort to invalidate the mortgage. So 17-105 has no application whatsoever." Counsel for the Limited Partners argued that "regardless of whether 17-101 or 17-105 would be applicable, or even if both are applicable, they both require a writing signed by the party." Supreme Court expressly rejected Council of Churches's argument, holding that "[b]ecause the WrapAround Note and Mortgage is a mortgage of real property, the issue whether it has been tolled or revived is not governed by GOL § 17-101, as Council [of Churches] asserts. Section 17-101, by its explicit terms, is inapplicable to actions for the recovery of real property." Thus, the applicability of GOL § 17-101 was emphatically raised by Council of Churches, and emphatically rejected by Supreme Court on a purely legal ground. It would be hard to find a better preserved issue. Though unnecessary as to the preservation analysis, the Appellate Division recognized that Council of Churches has argued tolling both under GOL §§ 17-101 and 17-105, and affirmed Supreme Court's rejection of the former as inapplicable (189 AD3d at 25). In our Court, Council of Churches' opening brief states: "This case is essentially a bilateral dispute between a creditor and a debtor: the case does not present any material question regarding the ownership of real property" (App Br at 10) and "[b]ecause the matter is simply a dispute between a debtor and a creditor, General Obligations Law § 17-101 governs" (*id*. at 11).

Further, the majority's assertion that the parties have made "no suggestion that the note and mortgage could or should be treated separately for tolling purposes" (majority op

at 8 n 2) is neither accurate nor relevant to preservation of the GOL § 17-101 issue. First, the majority substantiates its assertion with citations to a brief filed in this Court, which are not germane to the issue of whether the applicability of GOL § 17-101 was preserved below (and which argument, as discussed previously, was fully briefed, argued and decided).[4] Second, the majority's assertion mischaracterizes the entire first argument of Council of Churches's brief, spanning 13 pages, in which it argued that "[w]ith the exception of actions for the recovery of real property, General Obligations Law 17-101 effectively revives, or tolls, a time-barred contract claim when the debtor has signed a writing which validly acknowledges the debt," whereas "General Obligations Law § 17-105 only applies in an action to recover real property" (App Br at 16, 22). Third, even had Council of Churches not contended that the tolling provisions in sections 17-101 and 17-105 are different, by arguing below that section 17-101 applies (and, separately, because Supreme Court expressly decided that section 17-101 does not apply), the issue of the applicability of section 17-101 would be fully preserved.

---

[4] Had Council of Churches failed to raise the preserved issue of the applicability of GOL § 17-101 in our Court, that would constitute abandonment of the issue, not a failure to preserve it. Not only was the applicability of § 17-101 extensively briefed by both parties, but oral argument began with Council of Churches urging that "17-101 is applicable in all instances except for the recovery of real property" (Tr at 3) and that the instant action "is an action to determine the enforceability of a note and mortgage. And it's important for the court to understand that as we've seen through the legislative revision committee, the critical distinction is that a note is a promise to repay and a mortgage is the grant of an interest in real property" (*id.*).

A

A note is like an IOU. It is a contract in which a borrower agrees to repay a loan to a lender under certain terms and conditions (*see e.g., Carnwright v Gray*, 127 NY 92, 96 [1891]). If a borrower does not pay back the loan according to the terms of the note, the lender can sue for breach of contract and obtain a money judgment for the value of the debt left unpaid under the note (*see, e.g., Spodek v Park Prop. Dev. Assoc.*, 96 NY2d 577, 578 [2001]).

A mortgage secures a note (*see, e.g., Butler v Miller*, 1 NY 496, 500 [1848]; *Freedom Mtge. Corp. v Engel*, 37 NY3d 1, 21 [2021]). By signing a mortgage, the borrower puts up a piece of property as collateral for the loan. That means that if the borrower does not pay back the loan, the lender may begin foreclosure proceedings—the legal process by which the property that is secured by the mortgage is sold to satisfy the debt.

At common law, the holder of a note and mortgage could sue on the note and could sue on the mortgage. Suing on the mortgage—that is, initiating a foreclosure proceeding—could be the better legal strategy when the value of the debt was less than, or even close to, the value of the secured property because a foreclosure action provided the benefit of immediately barring any transfer of the land and the prospect of relatively quick satisfaction of the debt through the foreclosure and sale of the property. To recover any additional debt owed, the holder of the note would then need to initiate a separate action on the note. In contrast, suing on the note could be the better legal strategy when the mortgaged property was not sufficient to satisfy the debt and the debtor had other readily

available assets to satisfy a judgment. In that case, the note holder would sue on the note and obtain a money judgment in the amount of the debt held. But, in many cases, the best option was to file both a suit on the note and a foreclosure action simultaneously.

Section 1628 of the (former) Code of Civil Procedure (now RPAPL § 1301 [3]) modified the common-law rule and created New York's so-called "one-action rule": once a foreclosure action has been filed, a plaintiff may not simultaneously sue on the note without leave of the court in which the foreclosure proceeding is pending (*see, e.g., Reichert v Stilwell*, 172 NY 83 [1902]; *Central Tr. Co. v Dann*, 85 NY2d 767 [1995]). The purpose of the statutory rule "is to shield the mortgagor from the expense and annoyance of two independent actions at the same time with reference to the same debt" (*Central Tr. Co.*, 85 NY2d at 772, quoting *Reichert*, 172 NY at 88). The adoption of the "one-action rule," however, did not change the separateness of the note and mortgage; indeed, it accentuated it.

B

Sections 17-101 and 17-105 of the GOL mirror the difference between a lawsuit on a note and a foreclosure action. A suit on a note falls within section 17-101, which provides:

> "An acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and

rules other than an action for the recovery of real property"
(GOL § 17-101).

A suit on a note is an action to obtain a money judgment; it is not within "an action for the recovery of real property," and thus falls outside section 17-101's exclusion. A victorious party in an action on a note does not receive property; it receives a money judgment that it must subsequently collect. To revive a "stale" note, a mere written "acknowledgement . . . of a continuing contract" "signed by the party to be charged thereby" is sufficient.

By contrast, section 17-105 requires much more. That section applies to "the time limited for action to foreclose a mortgage" and provides:

> "[A] promise to pay the mortgage debt, if made after the accrual of a right of action to foreclose the mortgage and made, either with or without consideration, by the express terms of a writing signed by the party to be charged is effective, subject to any conditions expressed in the writing, to make the time limited for commencement of the action run from the date of the . . . promise" (GOL § 17-105).

Thus, it is much harder to revive a stale mortgage—it takes a "promise" in "the express terms of a [signed] writing." The wording of section 17-105 also illuminates an additional point about section 17-101: by choosing to not include the requirement of "express terms of a writing" in section 17-101, as it did in section 17-105, the Legislature clearly directed that implied acknowledgements are sufficient to revive a stale note, so long as they are contained "in a writing signed by the party to be charged thereby" (GOL § 17-101).

It is logical that the Legislature made the policy choice to make it harder to avoid the statute of limitations to foreclose than to recover a debt—and that an express promise to continue a security interest in real property will be required, whereas a debt may continue

to be enforceable even if the ability to foreclose has been lost.  Indeed, legislative history

demonstrates that the Legislature purposefully meant to distinguish between actions on the

debt (note) and actions to foreclose when it enacted the Real Property Law (RPL) § 251-a,

which was eventually codified as GOL § 17-105.  In 1961, when it enacted RPL § 251-a,

the Legislature included a footnote that explained that the provision was adopted pursuant

to a recommendation by the Law Revision Commission (*see* L 1961 Ch 582 n *, citing

1961 Legis Doc No 65[F] ["This is an amendment recommended by the Law Revision

Commission"]).    When it provided its recommendation to the Legislature, the Law

Revision Commission explained that the essential difference between a debt and a

mortgage animated its decision:

> "The proposition that an 'acknowledgement' revives a barred
> mortgage or tolls the statute of limitation applicable to an
> action to foreclose the mortgage leads to a result parallel to the
> rule under which an acknowledgment of a debt makes the time
> limited for action on the debt run from the date of the
> acknowledgment, whether the time had already expired or had
> merely started to run.  The latter rule, however, has been
> generally explained on the ground that the acknowledgment
> implies a new promise to pay the debt, supported by the moral
> consideration of the previous obligation. Consistently with this
> view, it is held that the 'acknowledgement' must be made in
> terms and in circumstances consistent with such a new
> promise.    This rationale is clearly inapplicable to an
> acknowledgment of a mortgage lien: a mortgage is not a
> promise, but an executed transaction; the mortgage lien is an
> interest in land requiring for its creation a written instrument
> which is a conveyance within the real property recording
> statutes" (*see* 1961 Rep of NY Law Rev Commn, reprinted in
> 1961 Legis Doc No 65[F], at 110).

As the Commission explained, a note is a contract—that is, an enforceable promise made

in exchange for consideration.  Because a note is "supported by the moral consideration of

the previous obligation," a mere acknowledgement is sufficient for "an action on the debt"—the acknowledgement is supported by the implicit consideration in reviving the debt (*id*.). That rationale does not work for a mortgage because a mortgage "is not a promise, but an executed transaction"—"an interest in land" (*id*.). Thus, the Legislature required a different, tougher standard for reviving a mortgage.

Our Court's precedent confirms the conclusion that section 17-101 applies to the note and section 17-105 applies to the mortgage. In *Petito v Piffath* (85 NY2d 1 [1994]), we considered both statutes in concluding that a time-barred foreclosure had not been revived. *Petito* was a "somewhat idiosyncratic" case because the defendant had reassigned his fully paid mortgage to his brother to prevent other creditors from levying against the property (*id*. at 4-5). Nevertheless, our Court had good reason to consider both statutes. As the record in that case reveals, *Petito* presented not only an action to cancel a mortgage pursuant RPAPL § 1501 (4) but also involved a plenary action for foreclosure and sale of the mortgaged property and for a deficiency judgment on any remaining amount owed under the underlying note. Accordingly, the statute of limitations for an action to recover on the note was also at issue, and thus, as we expressly stated, "[r]esolution of this controversy depends on the proper application of General Obligations Law §§ 17-101, 17-105(1) and § 17-107(2)(b)" (*id*. at 7). Indeed, most of the analysis in *Petito* centered on section 17-101. Contrary to the majority's assertion (majority op at 5), the parties *did* present our Court with the threshold question of which section of the GOL applied in a mortgage foreclosure action (*see Petito v Piffath*, Br of Plaintiff–Respondent, 1994 WL

16044902, 22-24, 28-33 [arguing that the statute of limitations was tolled under both GOL §§ 17-101 and 17-105]).

III

A

Determining that section 17-101 applies to the note, however, is not enough to resolve this case. Applying section 17-101 to the note—determining whether the documents submitted by Council of Churches constitute "[a]n acknowledgment or promise contained in a writing signed by the party to be charged thereby" (GOL § 17-101)—requires the resolution of factual questions that should be determined by the lower courts applying the correct legal standard, which they did not do.

Council of Churches argues that the limitations period is tolled by the Partnership's transmission to Council of Churches of both the financial statements and tax returns because both sets of documents "unambiguously disclose[] the WrapAround Note and Mortgage as a current liability of the Partnership, and contain[] nothing inconsistent with an intent to pay." Importantly, Council of Churches's argument is based not on the creation of those documents, but on the Partnership's distribution of the documents to Council of Churches. A factual dispute exists as to why those documents were transmitted. The Limited Partners contend that the Partnership transmitted those documents to Council of Churches in its role as managing partner, not as debt holder, but the managing partner had those documents without any need for transmission, because the documents were in the

possession of, and transmitted by, the managing partner. In addition, the Partnership Agreement required the Partnership to transmit the financial statements to the Limited Partners, but it contains no requirement that the Partnership transmit the financial statements to Council of Churches. Council of Churches claims the documents were transmitted to it in its capacity as debt holder, to reassure it that the Partnership continued to acknowledge the debt. In addition, at least one of the documents shows the liability on the Partnership's books even after the expiration of the statute of limitations, which tends to support Council of Churches's position. On cross motions for summary judgment, this unresolved question should preclude judgment for either party, and the matter should be remitted to Supreme Court for trial of the enforceability of the note on a full record using the legal standard set out in section 17-101, not section 17-105.

B

Also at issue before Supreme Court was whether the recommencement of mortgage payments beginning in February 2019 revived the limitations period for the mortgage. Supreme Court acknowledged that a partial payment can be effective in reviving an expired limitations period, but the court held that the payments here were void *ab initio* because Council of Churches's actions to recommence payment on the mortgage in the midst of litigation over whether it should be removed as general partner constituted a breach of fiduciary duty (2019 NY Slip Op 34037[U], 12), and the Appellate Division affirmed (189 AD3d at 28-29).

But that holding is wrong because the Partnership and Council of Churches are distinct legal entities whose corporate form cannot be disregarded other than by a proper evidentiary showing, which no party has argued.  In support of its holding, Supreme Court relied on a single case that deals with self-dealing by the same party—not two distinct legal entities—and was a New York case—not a District of Columbia case, the laws of which govern the Partnership (2019 NY Slip Op 34037[U], 12, citing *Szelega v O'Hara*, 159 AD2d 890, 891 [3d Dept 1990]).  Similarly, the Appellate Division did not consider any facts concerning veil-piercing or mention the doctrine at all, but instead cited a case for the general proposition that a general partner has fiduciary duties to other partners (189 AD3d at 29, citing *Marmac Inv. Co., Inc. v Wolpe*, 759 A2d 620, 626 [DC 2000]).  Neither court made any factual determination that the Partnership's payment of monthly installments due to Council of Churches under the note constituted a breach of fiduciary duty owed by Council of Churches, as managing partner, to the Limited Partners.

The corporate structure of and relationships between the parties admittedly present an unusual situation.  The tax returns are signed by the Partnership; the financial reports are signed by independent auditors, who are the Partnership's agent.  The Partnership was run by the managing partner, which was Council of Churches.  So, were one to ignore the legal separateness of the parties, Council of Churches prepared the documents that arguably revived the limitations period on the note for the benefit of Council of Churches, in its capacity as the noteholder.

But absent proof of fraud sufficient to disregard corporate forms, which the record does not contain, the Partnership (which signed or the agent of which signed) the

documents is a different legal entity than Council of Churches. In addition, the Limited Partners received the tax returns and the financial statements and, as the owners of 99% of the losses and profits (up to a point) of the Partnership, were clearly aware that the Partnership listed the note, including interest, as a current debt of the Partnership to Council of Churches even after the statute of limitations had expired. Moreover, whereas the Partnership Agreement requires transmission of the financial statements to the Limited Partners, it does not require transmission to the debt holder. Because the Partnership and Council of Churches are legally distinct entities (unless a veil-piercing showing had been made) and the Partnership had no obligation to distribute the financial statements and tax returns to Council of Churches, the burden falls on the Limited Partners (derivatively through the Partnership) to show that the transmission of those documents was not done for the purpose of acknowledging the debt, which they have failed to do. Finally, perhaps most importantly, whether any fiduciary duty was breached is the very subject of the federal lawsuit filed before this lawsuit, and, though on a preliminary injunction record and not on a full trial, the federal district court concluded that the Limited Partners were not likely to succeed on the merits of their claim that Council of Churches had breached its fiduciary duty to them.

IV

In sum, the proper result here has three parts. First, affirm that GOL § 17-105 governs the tolling or revival of the statute of limitations for an action to foreclose a mortgage and then hold that the Partnership's delivery of its financial statements and tax

returns to Council of Churches did not meet the requirements of section 17-105 (1) because they were not express promises to pay the mortgage debt—as the majority does. Second, having clarified that GOL § 17-101 governs the tolling or revival of the statute of limitations for an action on a note, remit for trial applying that legal standard, which would include whether the transmission of the documents to Council of Churches constituted an acknowledgement of the debt or merely a required formality carrying with it no implication of an intent to repay.

Third, I would stay consideration of the partial repayment issue because it is intertwined with the fiduciary duty issue pending in the first-filed federal litigation (*see, e.g.*, *Asher v Abbott Labs.*, 307 AD2d 211, 211-212 [1st Dept 2003] [reversing the motion court's denial of stay when "the federal action was commenced first, "the defendants in the actions are the same, there is substantial overlap between the issues raised in the two proceedings," and "the federal action will result in a more complete disposition of the basic . . . issues alleged" because "a stay will avoid duplication of effort and waste of judicial resources"]; *Halloran v Halloran*, 161 AD2d 562, 564 [2d Dept 1990] ["A court, pursuant to CPLR 2201, may *sua sponte* grant a stay of proceedings in an action that is pending before it"]). Only after the federal court set out its reasons that the Limited Partners were not likely to prevail did they come to state court to attempt what, if successful, would be an end run around the federal court. I am loathe to tolerate that sort of behavior.

Order affirmed, with costs. Opinion by Judge Troutman. Chief Judge DiFiore and Judges Garcia, Singas and Cannataro concur. Judge Wilson dissents in part in an opinion, in which Judge Rivera concurs.

Decided May 24, 2022